FOURNET, Chief Justice.
 

 This is another of those cases where an accused’s conviction and sentence were affirmed by this court after painstaking review of all of the errors allegedly committed during the course of the trial (State v. McAllister, 244 La. 42, 150 So.2d 557), following which the United States Supreme Court refused to review the matter on appeal or certiorari (McAllister v. State of Louisiana, 375 U.S. 260, 84 S.Ct. 362, 11 L.Ed.2d 311), only to have the conviction and sentence set aside on one of the alleged errors resolved by this court on the appeal here, under well settled law and jurisprudence, by a federal district court in a habeas corpus proceeding and a new trial ordered within a reasonable time “in accordance with law, or, failing to do so, release him from custody.”
 
 [1]
 
 McAllister v. Allgood, D.C., 249 F.Supp. 408.
 

 In order to properly resolve the issues raised in this case, it is necessary to give the facts in so far as pertinent in their chronological order. It appears that Mc-Allister, then 20, with Clayton Newman Carney, 22, following a burglary committed by them at the Billups Station in Hammond, Louisiana, Saturday night, July 23, 1960, conspired and agreed to rob the Spar Station in Amite, Louisiana, the following night, but, upon arriving there they saw a milk truck entering the station and, being unarmed, they postponed their plan until a more opportune time. In the meanwhile, McAllister, with money secured from Carney, procured a 32 caliber pistol from Ben Jackson, who dealt in firearms, late in the afternoon of Monday, July 25, 1960. After visiting around and taking a girl friend of McAllister’s, Diane Dennis, home around 11:00 p. m., as thus armed, McAllister and his accomplice approached the Spar Station in the early hours of July 26, 1960, around
 
 *387
 
 2:30 or 3:00 a. m., and, as the attendant, John O’Brien, 60, approached the car, Mc-Allister, upon opening the car door, shot him when he was about four feet away. He shot him again when O’Brien fell to his knees, and a third time as he lay on the ground. McAllister then ordered Carney to take the money from the inside cash register, while he himself took the money from the outside one, and they made their getaway. McAllister drove Carney to his home, telling him to hide the money and gun, which he turned over to Carney, and then McAllister went to his home.
 

 In. the meanwhile the sheriff’s office, having been alerted to the crime immediately by the Spar Station owner, who lived nearby and heard the shots, all available deputies converged on the scene. One of the deputies, after taking photographs at the scene, secured a spent bullet removed from O’Brien’s body by the coroner, which established it was fired from a 32 caliber pistol, and he took this bullet and O’Brien’s shirt and undershirt to the laboratory of the State Police Department in Baton Rouge. As the result of a canvass of all dealers in guns in the vicinity early the next morning, the sheriff’s office learned from one of them, Ben Jackson, that he had the previous day sold a 32 caliber pistol to a young man and his male companion, Jackson giving the investigating officers a detailed description of the two and also assisting them in recovering the "slugs” from the two bullets he fired .from the gun when it was purchased to establish it was in good working order, as well as the cartridge cases, all of which were also taken to the laboratory for testing, where it was established the “slugs” recovered at Jackson’s place and the one removed from O’Brien’s body were fired from the same pistol.
 

 From the descriptions and information furnished by Jackson, together with leads developed during the independent investigation by the sheriff’s department that followed, an order was issued for the pickup of McAllister. However, he was not found at his home or located around Hammond as late as ten o’clock that night, being picked up around midnight with his girl friend at Springfield, Louisiana, by Livingston Parish deputies, and by them turned over to Tangipahoa Parish authorities. The next day McAllister was identified by Jackson from a group of young men in a jail cell as the man to whom he had sold the pistol, which pistol, later, through ballistics tests, was proved to be the one used to kill O’Brien. On the afternoon of that day McAllister and his accomplice, who had, meanwhile, been picked up early in the evening of the previous day by a deputy sheriff, were interrogated and both made statements in the form of questions and answers in which they detailed their activities from the moment of the conspiracy until McAllister drove Carney to
 
 *389
 
 his home. After the notes taken by the stenographers in the sheriff’s office were transcribed as thus given and reduced to writing and read by McAllister and Carney, they were signed by them on August 3, 1960.
 

 On September 21, 1960, the grand jury of Tangipahoa Parish returned an indictment jointly charging McAllister and Carney with the murder of John O’Brien, and, being without funds to employ counsel, they were represented by able and diligent counsel furnished by the state. Following the trial in July of 1961, Carney was found “guilty without capital punishment,” and did not appeal. McAllister was found guilty as charged and sentenced to death, and this was affirmed by this court and by the United States Supreme Court, but reversed by the federal district court in Baton Rouge in a habeas corpus proceeding, as above set out. McAllister is appealing from his second conviction and sentence to death under an indictment charging him with the murder of John O’Brien on July 26, 1960, reliance for the reversal thereof being placed on 16 alleged errors committed during the course of the trial which, according to counsel, both orally and in brief, are divided into two categories, the first based on Bills of Exceptions Nos. 1, 2, IS, and 16, and the second based on Bills of Exceptions Nos. 3, 4, S, 6, 7, 8, 9, 10, 11, 12, 13, and 14.
 

 The four bills forming the basis of the first category argued here center around the Motion to Suppress under which the defendant sought to prevent the introduction of his statement on the ground it had been unconstitutionally obtained, as well as the alleged “tainted” fruits stemming therefrom. The first was reserved when the trial judge refused to permit defense counsel to call state witnesses under cross-examination during the hearing on the motion; the second when the motion was denied; the fifteenth when Exhibits 10 through 21, sought to be suppressed in the motion, were introduced in evidence during the trial over counsel’s objection; and the sixteenth when Carney, whose testimony was also sought to be suppressed in the motion, was permitted to testify.
 

 The first bill is clearly without merit. The trial judge very aptly points out in his per curiam that he knew of no law and no jurisprudence that permitted such a procedure as calling state witnesses under cross-examination in criminal matters, and counsel has cited none. The judge specifically advised counsel the witnesses were available to the defendant as his own witnesses, subject to evidentiary rules, allowing counsel great latitude during their examination as such.
 

 The basic argument with respect to the next three bills urged in the first category is that the statement made by McAllister
 
 *391
 
 is unconstitutional since it was made following his arrest at a time when he was without legal counsel, and was, therefore, inadmissible against him, and that the remainder of the evidence and testimony sought to be suppressed was secured as a result of information contained in the statement, hence was also inadmissible, these being the 12 exhibits above referred to and the testimony of Ben Jackson, of Carney, and of the ballistics experts.
 

 In his per curiam to the second bill the trial judge points out that McAllister’s statement or confession was never introduced in evidence during the trial and the jury therefore had no knowledge of its contents. With respect to the testimony and exhibits, he advises these were not secured as a result of information contained in the statement, for the sheriff’s office was aware of the information about which Ben Jackson was to testify even before the defendant was a suspect; that the exhibits were not taken from the person of the defendant or any of his constitutionally protected property, and that the testimony of the experts was derived from these exhibits and, therefore, admissible.
 

 As to Carney’s testimony, the objection at the time he took the stand, as reflected by Bill of Exceptions No. 16, was that he was serving a sentence resulting from an alleged unconstitutional conviction; consequently, that such evidence as he might give against the defendant was also unconstitutional. We think the trial judge’s ruling permitting this testimony was correct. In his per curiam he advises that the jury was aware at the time Carney was testifying he was serving the sentence under the prior conviction, and that this was a matter to be considered by the jury in determining the weight to be given the testimony, the same as that of any other witness.
 

 It is clear, therefore, that the argument of defense counsel under the first category lacks substance. Defendant’s statement was not offered in evidence and the contention that the evidence and testimony sought to be suppressed under these bills were secured as a result of information contained in the statement is not sustained by the facts, which establish, instead, that the evidence leading to his arrest and conviction were secured as the result of the alert and independent investigation conducted by the sheriff’s department.
 

 Counsel for the defendant, both orally and in brief, conceded that if the bills forming the basis of the second category argued were “taken independently of each other, they would have no merit, but considered collectively, the court can well appreciate the hostilities and prejudices that existed against the defendant during the course of his trial,” that prevented him from securing a fair and impartial hearing. If this were not a review of a case in
 
 *393
 
 volving capital punishment, we could easily agree with counsel that these bills taken independently are without merit, and to hold, additionally (as will be reflected from our review of them), that taken collectively they do not support the claims made by defense counsel.
 

 Bill of Exceptions No. 3 was reserved when the trial judge denied request of defense counsel that the jurors, as selected and sworn, be sequestered under Article 791 of the Code of Criminal Procedure.
 
 [2]
 
 It is obvious from counsel’s argument in this court that he has misconstrued the object and purpose of this article, which is labelled “Sequestration of jurors and jury.” Although his bill does not so state, the record discloses he was seeking to have the jurors as selected removed from the courtroom so that they could not hear the questioning of the other prospective jurors, whereas the article relied on provides only for keeping the jury together after selected and sworn, as well as secluded from
 
 outside communication,
 
 which procedure, according to the trial judge’s per curiam, was followed.
 

 After the trial judge refused to sequester the selected jurors in the manner requested under Bill No. 3, the defendant reserved his fifth bill when the trial judge refused to order that all prospective jurors be cleared from the courtroom. This bill is equally without merit as an accused is not accorded this right under the Code of Criminal Procedure and counsel cites no -authority to sustain this contention and advances no sound reason therefor.
 

 Bills Nos. 4, 6, 7, and 12
 
 [3]
 
 were reserved when defendant’s motions for mistrial, based on statements made by prospective jurors during their voir dire examination, that were not responsive to the questions put to them, were denied. The trial judge, in each instance, promptly instructed the jurors selected, as well as the remaining panel, to ignore such statements, as
 
 *395
 
 the case was to be determined solely by the evidence heard from the witness stand and the law as given to the jury by the court.
 

 Bill of Exceptions No. 8 was also reserved during examination of prospective jurors, when the trial judge refused to grant another motion for a mistrial, labelled by counsel as “perhaps one of the more serious” in this group. It is levelled at the fact that although the sheriff and one of his deputies had been sequestered as state witnesses, they were allegedly talking to and in contact with prospective jurors.
 

 In his per curiam the trial judge points out that at the time this was called to his attention, not a single juror had been chosen from the prospective venire. Our examination of the record supports the correctness of the judge’s ruling. At the time defense counsel objected because the sheriff and his deputy “had access to prospective jurors,” he conceded they had not been in the courtroom, and it was established dux-ing his examination of these men that the only contact they had with prospective jurors occurred in the foyer of the courthouse, or else outside the building, and consisted of nothing more than general greetings between the sheriff, his deputy, and men personally known to them. Clearly this could not have been a violation of Article 764 of the Code of Criminal Procedure, which provides for the exclusion of witnesses, as the sole purpose of this article is to have witnesses removed from the courtroom, or from where they can see or hear the proceedings, to insure that the witness will testify as to his own knowledge of the case without being influenced by the testimony of other witnesses. See, State v. Carter, 206 La. 181, 19 So.2d 41; and State v. Lewis, 250 La. 876, 199 So.2d 907.
 

 Bill of Exceptions Nos. 9 and 10 were reserved immediately following the judge’s ruling on the eighth bill, the former when the judge denied defense motion for a change of venue, predicated on the contention he could not secure a fair and impartial trial, the latter when the judge refused to have the voir dire examination of all prospective jurors in this trial, as well as that of some 519 prospective jurors in the first trial, made a part of the motion for a change of venue. The trial judge correctly ruled in denying these motions that the request for a change of venue at this stage of the proceedings came too late. Under the express provisions of the Code of Criminal Procedure, such a motion must be filed at least two days prior to the commencement of the trial. Article 621.
 

 Bill of Exceptions No. 11 has apparently been abandoned as it is not perfected, and although the 13th and 14th bills were perfected, they have also apparently
 
 *397
 
 been abandoned as they are not argued in this court. Bill of Exceptions No. 13 was reserved when the trial judge permitted the district attorney to deliver to the defendant notice in writing of intention to introduce his confession in evidence, as provided by Article 768 of the criminal procedural code, and Bill No. 14 when it was discovered Leo Lanier, a sequestered state witness, was in the courtroom. In any event, there is no merit to these bills, the former because the statement was never in fact introduced, the latter because at the time it was discovered Lanier was in the courtroom, no evidence had been adduced and the witness was required to leave immediately.
 

 For the reasons assigned, the conviction and sentence are affirmed.
 

 BARHAM, J., concurs in the result, concluding under Bills of Exception Nos. 2 and 15 that as a matter of law there was no merit in the motion to suppress certain evidence alleged to have been' secured through information derived from a confession obtained in contravention of the defendant’s constitutional rights, since the derivative evidence or “tainted fruit” doctrine is inapplicable to confessions.
 

 [1]
 

 . It is apt to observe that the federal district judge felt duty bound to follow another decision of the United States Supreme Court decided in 1985, after the decisión in the first McAllister appeal in 1963, namely Turner v. State, 379 U.S. 466, 85 S.Ct. 446, 13 L.Ed.2d 424.
 

 [2]
 

 . This article provides that “A jury is sequestered by being kept together in charge of an officer of the court so as to be secluded from outside communication. In capital eases, after each juror is sworn he shall be sequestered.” In non-capital cases, the matter is one for the discretion of the trial judge.
 

 [3]
 

 . Bill No. 4 covers the statement of prospective juror Earl A. Edwards, who said he had a fixed opinion as to the guilt or innocence of the accused as he had “already had one trial.” Bill No. 6 covers the statement by Thomas H. Burt, Jr., who, when pressed by the state to disclose whether he had formed an opinion, replied : “Well, is it permissible to say that the defendant has signed a statement?” While the judge was questioning Charles B. Ivy, Jr., the judge informed the state a Mr. Dameron should be excused ás he had been called as a juror “on the occasion of the last trial.” This is the basis for the seventh bill. Bill of Exceptions No. 12 was reserved when prospective juror Elliott Nickens, asked if he had an open mind, said: “No, sir, from what I read he seems to be guilty.”