solved and would bring about ludicrous results, saying:

"Such a system of trial can only operate to destroy the independent determination of either the judge or jury in their conscious or unconscious efforts to avoid the ludicrous consequences of opposite results reached in the same trial on the same evidence. Any system which fails to realize this fact fails to comprehend the realities of human behavior and disregards a vital requirement of the law: Even-handed justice must be done, and it must appear that even-handed justice is being administered by the Courts."

The distinction the Court seeks to draw between this case and Jobe v. Hodge fails to take into consideration the basic intent of the Legislature in enacting Section 5104 of Title 13 of the Revised Statutes, which I understand to be that any suit involving a public body as a party, either in a principal or incidental capacity, cannot be tried by a jury.

Moreover, Article 1735 of the Code of Civil Procedure provides that when a jury trial is granted in a lawsuit, there can be but one trial. The majority decision is in direct conflict with this mandate, for it grants a jury trial as to the principal defendants and grants another and separate trial as to the Department of Highways, the defendants in the third party demand. Granted a separate trial may be allowed in some circumstances, that result cannot obtain when a jury trial is allowed in the suit in any particular. Error was committed by the Court therefore in permitting a jury trial in this case, and it was error to grant a separate trial once a jury trial was ordered.

I respectfully dissent.

232 So.2d 499

**STATE of Louisiana**

**v.**

**John POLAND.**

**No. 49971.**

Feb. 23, 1970.

Scallan E. Walsh, Donald T. W. Phelps, Bert K. Robinson, Baton Rouge, for appellant.

Jack P. F. Gremillion, Atty. Gen., William P. Schuler, Asst. Atty. Gen., Sargent Pitcher, Jr., Dist. Atty., Ralph L. Roy, Asst. Dist. Atty., for appellee.

FOURNET, Chief Justice.

The defendant, John Poland, is appealing from his conviction and sentence to death on an indictment charging him with murder, relying for the reversal thereof on 23 of the many Bills of Exceptions reserved during the course of the trial.

The first of these, Bill of Exceptions No. 3, was reserved when the trial judge overruled the defense plea of double jeopardy. The basis for this bill lies in the fact that the defendant, who had, on May 6, 1966, pleaded guilty to and been sentenced under the charge of attempting to murder one Joseph Sanchez, was indicted on June 15, 1966, following the subsequent death of Sanchez, for his murder. Counsel for the defendant contend that the "attempted murder merged into and became murder when the victim succumbed," and there was, therefore, but one offense; consequently, to charge defendant with the second charge after he had been convicted under the first constituted double jeopardy. In support thereof, counsel rely on State v. Yokum, 155 La. 846, 99 So. 621; State v. Roberts, 152 La. 283, 93 So. 95, 24 A.L.R. 1122; State v. Foster, 156 La. 891, 101 So. 255; State v. Schneller, 199 La. 811, 7 So. 2d 66; State v. Sawyer, 220 La. 932, 57 So.2d 899; Ex parte Nielsen, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118, and Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370.

In adopting the Louisiana Code of Criminal Procedure by Act 310 of 1966, the legislature, in conformity with our constitutional guarantee contained in the Bill of Rights, to the effect that no person shall "be twice put in jeopardy of life or liberty for the *same offense*" (Section 9 of Article I), provided that "No person shall be twice put in jeopardy of life or liberty for the *same offense,* except, when on his own motion, a new trial has been granted or judgment has been arrested, or where there has been a mistrial legally ordered under the provisions of Article 775 or ordered with express consent of the defendant." Article 591. It further provided

that "Double jeopardy exists in a second trial only when the charge in that trial is: (1) *Identical with or a different grade of the same offense* for which the defendant was in jeopardy in the first trial, whether or not a responsive verdict could have been rendered in the first trial as to the charge in the second trial; or (2) Based on a part of a continuous offense for which offense the defendant was put in jeopardy in the first trial." Article 596. (The emphasis has been supplied.)

The identical issue here urged was decided adversely to the defendant's contention in State v. Wheeler, 173 La. 753, 138 So. 656. In that case, and in reliance on the authorities cited, it was held that a prosecution for the crime of murder was not barred because defendant had been previously convicted of shooting with intent to murder. In so ruling, this court stated the offense previously charged and the offense with which the defendant was subsequently charged were not identical, nor different grades of the same offense, nor was one necessarily included in the other; consequently, that neither an acquittal nor a conviction of shooting with intent to murder was a bar to a prosecution for murder upon the death of the injured person.

This is in accord with the law generally prevailing on the subject. As pointed out in American Jurisprudence, Second, "According to a general precept of criminal law, if, after the first prosecution, a new fact supervenes for which the defendant is responsible, and which changes the character of the offense and, together with the facts existing at the time, constitutes a new and distinct crime, an acquittal or conviction of the first offense is not a bar to an indictment for the other distinct crime. Thus, *neither an acquittal nor a conviction for assault while the person assaulted is still living will bar a prosecution for murder or manslaughter instituted after the person assaulted dies on account of the injuries received; and the trial for murder does not place the defendant twice in jeopardy.*" Volume 40, Homicide, page 470, Section 186. See, also, 1 Bishop's New Criminal Law, Section 1059, page 634; 2 Wharton's Criminal Evidence, 12th edition, Section 653; 22 C.J.S. Criminal Law § 287c, p. 753; 21 Am.Jur.2d 242, Criminal Law, Section 186; annotations at 37 A.L.R. 2d 1068 and 11 A.L.R.3d 834; Diaz v. United States, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500; People v. Harrison, 395 Ill. 463, 70 N.E.2d 596, certiorari denied 334 U.S. 812, 68 S.Ct. 1013, 92 L.Ed. 1744; State v. Littlefield, 70 Me. 452, 35 Am.Rep. 335; State v. Wilson, 85 Ariz. 213, 335 P.2d 613; and Commonwealth v. Ramunno, 219 Pa. 204, 68 A. 184, 14 L.R.A.,N.S., 209. (Emphasis supplied.)

In People v. Harrison, the leading case in this country in the field, the court pointed out that the crime of murder was not

an offense of which defendant might have been convicted on an indictment charging an assault with intent to commit murder; consequently, that at the first trial he was not "in peril of being convicted" of the charge of murder. The reason for this, as pointed out by the United States Supreme Court in the Diaz case, is that "The homicide charge * * * in the court of first instance and the assault and battery for which he was tried * * * although identical in some of their elements, were distinct offenses both in law and in fact. The death of the injured person was the principal element of the homicide, but was no part of the assault and battery. At the time of the trial for the latter the death had not ensued, and not until it did ensue was the homicide committed. Then, and not before, was it possible to put the accused in jeopardy for that offense." Furthermore, the evidence in support of the indictment for murder could not have secured a conviction of that crime on the first indictment, charging only assault on a person then living. Commonwealth v. Ramunno, 219 Pa. 204, 68 A. 184, 14 L.R.A.,N.S., 209.

The authorities relied on by defense counsel are inapposite from a factual and legal standpoint. In fact, State v. Yokum and State v. Foster are to the contrary,[1] while the United States Supreme Court in the Prince case was careful to point out that its holding turned on the particular federal statute involved and was to be differentiated from similar problems in this general field raised under other statutes. The remaining cases constitute continuing offenses, specifically provided for in the second part of Article 596 of the code, and are to the effect that conviction or acquittal as to such an offense on a particular day or in a particular parish would serve to bar a second prosecution for this same offense on a different day or in another parish.[2]

The next bill relied on, No. 6, was reserved when the trial judge overruled defendant's motion for a change of venue, the contention being that the wounding and subsequent death of Sergeant Sanchez in the line of duty "provoked publicity from radio, television, and newspapers" in East Baton Rouge Parish, and this, together with

1. The Yokum case held that acquittal on a charge of manufacturing and selling intoxicating liquor would not bar a subsequent prosecution for unlawful possession of this same liquor. The Foster case held that acquittal of attempted arson would not bar a subsequent prosecution for assaulting the owner of the building just before the alleged offense of arson.
2. State v. Roberts, unlawful possession and transportation of intoxicating liquor in

two different parishes; State v. Schneller, possession of stolen property on different dates; State v. Sawyer, driving under the influence of liquor in two parishes. However, the Sawyer case also points out a charge against this same defendant arising out of driving a second vehicle several hours later was different, and a plea of double jeopardy based on the original offense would not bar this prosecution.

the nature of the case and the publicity given a fund raised for Sanchez, created a real danger that he could not get a fair trial in Baton Rouge.

■■ The granting of a change of venue is to be exercised with caution and always rests within the sound discretion of the trial judge, whose ruling denying the motion for same will not be disturbed unless the evidence affirmatively shows his ruling was unfair and a clear abuse of judicial discretion. State v. Roberson, 159 La. 562, 105 So. 621; State. v. Collier, 161 La. 856, 109 So. 516; State v. Washington, 207. La. 849, 22 So.2d 193; State v. Pearson, 224 La. 393, 69 So.2d 512; and State v. Lejeune, 248 La. 682, 181 So.2d 392. In addition, the burden of establishing by legal evidence that the applicant for a change of venue could not secure a fair trial in the parish where he was charged with committing a crime, rests upon the applicant. Article 622 of the new Code of Criminal Procedure; State v. Faciane, 233 La. 1028, 99 So.2d 333; and State v. Lejeune, supra, and the authorities therein cited.

As pointed out in the Lejeune case, "The test to be applied is whether there can be secured with reasonable certainty from the citizenry of the parish a jury whose members will be able to try the case uninfluenced by what they might have heard in the matter, and who will give the accused the benefit of any reasonable doubt which might arise from the evidence or from the lack thereof." [3] See, State v. Wilson, 240 La. 1087, 127 So.2d 158; State v. Scott, 237 La. 71, 110 So.2d 530; State v. Rogers, 241 La. 841, 132 So.2d 819, and the authorities therein cited.

■ A careful review of the note of evidence, together with the exhibits made a part of this bill, convinces us the trial judge did not abuse the discretion vested in him. In his reasons for overruling the motion he stated that although the public was alerted to what happened in this case at the time, as they are in all crimes involving homicide, of the many witnesses produced by defendant to substantiate this claim, only one said he did not feel he could bring in a fair verdict by reason of the publicity. Furthermore, the judge reminded that the publicity attendant upon the incident at the time it occurred had greatly subsided because of the length of

3. Article 622 of the new code provides: "A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending. In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."

time between that time and the date of defendant's trial on the subsequent charge.

In this the judge is supported by the record, which reveals the shooting of Sanchez, resulting in his subsequent death, occurred on the night of April 16, 1966, and the trial did not occur until the latter part of March 1967, almost a year later. The exhibits of news articles and broadcasts introduced in evidence occurred around the time of the shooting, and this was not very prolonged because of the fact the defendant was apprehended within two days and tried on the charge of attempted murder of Sanchez May 6, 1966, less than a month later. References to Sanchez in the news media later during 1966 were in connection with a fund started for him shortly after the shooting, and even these were merely as a sidelight to publicity relative to funds being raised for others.

■ The next bills relied on by defendant (Nos. 7 and 37) will be treated together as they are bottomed on the contention the grand jury returning the indict-

ment against him was illegally constituted and discriminatory, the former having been reserved when defense motion to quash the indictment was overruled, the latter when his motion in arrest of judgment was not granted. It is argued the jury was selected solely from the parish list of registered voters and the federal courts held portions of Louisiana laws controlling such registration to be illegal and unconstitutional in United States v. Louisiana, D.C., 265 F.Supp. 703; Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709, and United States v. Clement, 5 Cir., 358 F. 2d 89.

These authorities do not sustain the contention of defense counsel. The legality of the jury venire of East Baton Rouge Parish under Louisiana voter registration laws was not involved in any of these cases; nor were provisions of Louisiana law under which this registration role was made up declared therein to be illegal and/or unconstitutional.[4] Furthermore, the same argument that the practice of taking names in

---

4. Although the constitutionality of Louisiana's registration application was originally challenged in United States v. Louisiana, the court points out that after the suit was instituted the challenged form was revised by the state in June 1965. The remainder of the decision turned on whether *federal agents correctly applied* Louisiana voter registration laws in 5 parishes—East Carroll, East Feliciana, West Feliciana, Ouachita, and Plaquemines. In Louisiana v. United States the court held the reasonable "interpretation test" *as administered* to ap-

plicants in 21 Louisiana parishes where it had been followed was unconstitutionally applied, but also pointed out this test had been superseded by the "citizens test," the constitutionality of which was not at issue in the case. East Baton Rouge was not one of these 21 parishes, which are listed at 225 F.Supp. 385. The case of United States v. Clement involved *practices of registrars* in the parishes of Webster and Red River with respect to requiring voters to take literacy, knowledge, and understanding tests.

the general venire from the registration rolls constituted discrimination against Negroes was advanced in State v. Rideau, 249 La. 1111, 193 So.2d 264. This court, upholding the lower court's ruling that defendant made no showing of racial discrimination in the registration of voters, pointed out, further, that the evidence established the jury bodies were formed without discrimination because of race. The Supreme Court of the United States refused to review this holding. 389 U.S. 861, 88 S. Ct. 113, 19 L.Ed.2d 128.

Additionally, the authorities relied on by defense counsel do not support their contention under these same bills that defendant made out a prima facie case of discrimination against Negroes which must stand since this evidence was not rebutted by the state, i. e., Coleman v. Alabama, 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed.2d 22, and Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25.

The evidence offered by defendant in this respect consisted of (1) an affidavit reflecting that during the months of May, June, and July 1966 the registration rolls of East Baton Rouge Parish consisted of approximately 85,500 voters, of which some 15,000 or 17.8%, were colored; (2) the 1960 census of the parish; and (3) a stipulation to the effect that if the clerk of court of the parish were called as a witness he would testify the venire was made up solely of names on the registration rolls "and that this selection had been without regard to race, color or creed."

This court in State v. Bennett, 251 La. 1115, 208 So.2d 695, where, as here, reliance was placed on the testimony of this same clerk of court for East Baton Rouge Parish, and which was also to the effect the venire had been taken solely from the names on the registered voter lists, held that by such a showing the defendant had not made out a prima facie case of discrimination under what might be termed "guidelines" in this field laid down by the federal court in the leading case of Brooks v. Beto, 5 Cir., 366 F.2d 1, certiorari denied 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135, for the selection of juries that are truly representative of the community; consequently there was nothing for the state to rebut in such cases.

We think the facts in this case are even stronger than those in the Bennett case, for here counsel have not only stipulated the clerk of court, if called, would testify the venire was selected from the registration rolls without respect to race, color, or creed, and which list contained in fact approximately 15,000 members of the Negro race, but, in argument, concede the members of the jury commission in selecting the venire from this list acted in good faith, and with no specific intention of excluding Negroes from jury venires.

■ The cases of Coleman v. Alabama, 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed.2d 22, and Jones v. Georgia, 88 S.Ct. 4, 389 U.S. 24, 19 L.Ed.2d 25, do not sustain the defense contention that the mere establishment of a disparity between the number of Negroes on the venire list makes a prima facie case of discrimination that must stand where not rebutted by the state. In both cases the United States Supreme Court held the presumptions and factors employed by the state courts to overcome the prima facie showing made out by the defense under the particular facts established were not acceptable, and the cases were remanded for further proceedings consistent with this holding.[5]

■ The next two bills are purportedly levelled at rulings by the trial judge in refusing to sequester prospective jurors during examination on their voir dire (Bill of Exceptions No. 8), and in refusing to instruct the prospective *jurors* to refrain from watching, reading, or listening to news accounts concerning the case. Bill of Exceptions No. 9.[6]

Neither of these bills has merit. The same argument with respect to sequestration of prospective jurors was decided adversely to defendant in State v. McAllister, 253 La. 382, 218 So.2d 305. With resepect to Bill No. 9, the case of Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed. 600, relied on by counsel, is inapposite factually and therefore is not controlling.

The Sheppard case, probably the most celebrated murder trial of the century, presented an extreme situation where the community was subjected to massive pretrial

---

5. In the Coleman case defendant established no Negro had ever served on a grand jury panel and few, if any, had served on petit jury panels up until the time of this trial. The court held such proof was not rebutted by the state court's assertion this could be attributed to the fact a number of Negroes moved away, or else had been disqualified as incompetent by reason of felony convictions.

In the Jones case the court held the prima facie showing within the ruling in Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599, of the systematic exclusion of Negroes from grand and petit juries—selected from a list of taxpayers separated and identified by race—was not rebutted by the state court's resort to presumptions with respect to (1) public officials correctly discharging their duties in the light of their oath, or (2) the presumption of incompetency rather than racial discrimination.

6. The record reflects no such bill was ever reserved. Obviously counsel was relying on an objection to the court's refusal to instruct prospective *witnesses* to refrain from resort to news reports during the trial, as reflected by the transcript and the following notation in the court minutes: "On motion of counsel for the accused, the court ordered sequestration of witnesses in this case. Counsel for the accused requested the court to include in its instructions to the witnesses that they were not to read anything pertaining to this case during the trial of the case. The court denied this motion of counsel, to which ruling of the court counsel for the accused excepted and reserved a bill * * *." However, such a bill was never perfected; and, in any event, is not relied on or discussed in this court.

and trial publicity through all types of news media, including discussion of evidence never presented at the trial; interviewing at will of prospective witnesses, their verbatim testimony being reproduced regardless whether admissible or inadmissible during the trial; after the jury was selected it was not sequestered and the judge made no effort to insulate the jurors from the unusual flood of publicity, including the listing of their names even before they were chosen, thus subjecting them to importuning from all sides. In other words, both before and during the trial the news media, for all intents and purposes, took control of the entire matter, including the courtroom, exhibits, witnesses, and jurors. The United States Supreme Court held that in this "Roman holiday" atmosphere for the news media Sheppard had not secured a fair trial.

■ The last group of bills relied on for reversal of the conviction and sentence, some 17 in all,[7] are predicated on the contention of defense counsel that the trial judge erroneously excused prospective jurors for cause over defendant's objection on the mere general assertion by the juror that he entertained conscientious scruples against the infliction of the death penalty, allegedly contrary to the holding of the United States Supreme Court in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.

In that case the court was careful to point out that the issue before it was a narrow one, stating: "It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt. *Nor does it involve the state's assertion of a right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them.* For the State of Illinois did not stop there, but authorized the prosecution to exclude as well all who said they were opposed to capital punishment and all who indicated that they had conscientious scruples against inflicting it." (The emphasis has been supplied.)

The Witherspoon case is not, therefore, controlling, for a study and analysis of the note of evidence attached to these bills reflects that both the prosecuting attorney and the trial judge were careful to follow the ruling of this case to insure that only a "neutral" jury was selected to try the defendant.

In his questioning of the prospective jurors on their voir dire, the prosecuting attorney was careful to point out to them, in essence, that the case being tried was a capital case, meaning the accused was charged

7. Bills Nos. 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 26, 27, and 28.

with murder. Murder under our law may carry with it the penalty of death. If you find from the evidence the accused is guilty as charged, then necessarily, under our law, the judge has no recourse but to sentence him to death. But you have an option. There are no restrictions on your discretion with reference thereto. Should you find the accused guilty of a capital crime, you have the right to return a verdict of guilty without capital punishment. The law offers no guidelines, but you are free to decide either way. Knowing the law does not require you to return a verdict carrying the death penalty, could you, under such circumstances, return a verdict that would carry the death penalty.

If the juror said he could not under such circumstances return a verdict of guilty as charged because he did not believe in the death penalty, because it was against his religion, because of his conscientious scruples, because he did not want to be the one to point the finger at the defendant, because the scriptures admonish that if you cannot give a life you have no right to take a life, or for whatever reason, then the prosecutor turned him over to the trial judge and submitted him for discharge for cause.

8. It is apt to observe that Louisiana accords an accused a similar right to challenge for cause any juror who entertains a prejudice against rendering a qualified verdict, the converse of the situation here.

The trial judge then undertook a personal examination of the prospective juror, probing his conscience to ascertain his ability to return a verdict of guilty as charged despite his scruples against capital punishment. His questioning was along this line: Say, for the sake of argument, that, after you hear all of the evidence in the case, argument of counsel for the state and the defendant, and the law as given by the court, you are convinced beyond a reasonable doubt of the guilt of the accused as to the crime of murder, could you, because of your scruples, of the conscientious scruples you entertain, bring in a verdict of guilty as charged, knowing that if you did that, and the other jurors agreed with you, because it has to be unanimous, the only sentence the court could impose upon the accused would be the sentence of death.

It was only when the juror stated that under no circumstances could he ever return a verdict of guilty as charged, regardless of the evidence and the law, and his conviction as to the guilt of the accused, that the trial judge finally excused the juror challenged by the state for cause on this ground.[8]

For the reasons assigned the conviction and sentence are affirmed.

State v. Henry, 196 La. 217, 198 So. 910; State v. Jackson, 227 La. 642, 80 So.2d 105; and State v. Weston, 232 La. 766, 95 So.2d 305.