250 So.2d 382

**STATE of Louisiana**

v.

**James Edward CRIPPS and Larry Joe Purkey.**

**No. 50359.**

June 28, 1971.

Edward Koch, Jr., John C. Ciolino, New Orleans, for defendants-appellants.

Jack P. F. Gremillion, Atty. Gen., Harry H. Howard, Asst. Atty. Gen., Jim Garrison, Dist. Atty., Louise Korns, Asst. Dist. Atty., for plaintiff-appellee.

McCALEB, Chief Justice.

James Edward Cripps and Larry Joe Purkey were indicted, tried and convicted of the murder of Taylor McLaurin, Jr., in New Orleans on February 27, 1968. Following imposition of death sentences they prosecuted this appeal relying on nineteen bills of exceptions reserved during the proceedings below for reversal of their convictions.

The pertinent facts of the case, as shown by the perfected bills, reveal that McLaurin, a 1968 Carnival visitor, met the appellants and one Danny Franklin, alias Boudreau, at an Iberville Street lounge on the evening of the killing and bought drinks for them. Later that night, the four men went in McLaurin's automobile, ostensibly for the purpose of driving Cripps to his home, but in reality so that appellants and Franklin could roll and rob McLaurin.

Shortly after midnight as McLaurin was driving the automobile through City Park near the Lagoon, Purkey, who was seated in the rear, suddenly put his arms in a vise-like grip around McLaurin's throat from behind breaking the victim's neck; while Cripps, occupying the front passenger seat, simultaneously beat McLaurin savagely on the face and head. Thereafter, appellants and Franklin took $40.00 from McLaurin's wallet, threw his body in the Lagoon and drove off in the victim's car. A day or so later McLaurin's car was driven to Texas by one Apache and Boudreau disappeared. On March 8, 1968, McLaurin's body was discovered floating in the City Park Lagoon and an autopsy revealed that the victim had been strangled and beaten on the head.

Some four days later (March 12, 1968), an informer contacted Officer Eugene Fields of the New Orleans Police Department stating that he knew of someone who could furnish information about the

death of McLaurin. As a result of this conversation Officer Fields met James Keesler that same night and learned that on March 1, three days after the killing, Keesler had been invited by Cripps to dinner at the latter's apartment on Dumaine Street; that Larry Jo Purkey, known as "Rat", and a couple of other men were present; and that after dinner, during conversation, Cripps related how he, Purkey and Boudreau met a fellow at a French Quarter bar, had taken him out, rolled and killed him by snapping his head and, thereafter, throwing his body into the City Park Lagoon. After receiving this information the police officers began searching for Cripps and Purkey and arrested them at the China Doll Lounge at about 11 o'clock p. m. Appellants were then taken to police headquarters where they were fully informed of their constitutional rights in accordance with the Miranda decision. After signing a Rights of Arrestee Waiver Form, each appellant confessed the crime in detail and Purkey demonstrated to the police the hold he had used to break McLaurin's neck.

As stated above defendants reserved nineteen bills of exceptions. However, on this appeal defense counsel have presented in brief and oral argument only eleven of these bills. Nevertheless, the other eight bills have not been specifically waived and, since this is a capital case, we will consider all of the bills. Some of them present the same question of law and hence will be discussed together.

## BILLS OF EXCEPTIONS NOS. 1, 12 and 19

Bills 1 and 19 were taken to the ruling of the trial judge that the bill of particulars furnished to appellants by the State and the State's answer to appellants' prayer for oyer were sufficient in law. Bill No. 12 was taken during the trial to the testimony of Dr. Ignacio Medina, the Coroner, who identified the proces verbal of the autopsy of McLaurin's body, which stated the cause of death. The objection to this evidence relates to the refusal of the judge to require the State to produce the proces verbal of the Coroner prior to trial.

In their application for bill of particulars appellants requested to be informed of the time and location of the offense; the nature of the force used; the date, time and location of the arrest; the circumstances under which appellants were identified; whether the arrest was made pursuant to a warrant and whether the State had any confessions or statements which would be used in evidence.

In its bill of particulars, the State replied that the crime was committed in New Orleans near the lakefront area; that appellants were arrested on March 12, 1968 about 11 p. m. in the 600 block of Iberville Street; that the State has written

confessions which would be used in evidence at the trial; and that it is not required to furnish any further information.

In appellants' prayer for oyer they seek production of all oral confessions as well as written confessions; all confessions reduced to writing but not signed; all statements of appellants reflected in the police reports; a copy of all technical and laboratory reports; an examination of all objects found at the place of the crime; a description of any objects which might have been removed from the place of the crime; a copy of all police pictures of the scene; the autopsy report relating to McLaurin's death; all films depicting interviews with appellants; all weapons or other objects connected with the crime; all objects taken from appellants relevant to the crime; all warrants used by the police in connection therewith; and the proces verbal of any lineup identifications which might have been conducted.

At the hearing of the above motions the trial judge ruled, correctly we think that, in the absence of a plea of self-defense, he would not order the State to produce any weapons connected with the crime and that the State was required to furnish only such pretrial information as was required by law. In his per curiam to Bill No. 1 the judge noted that, prior to the trial, the district attorney informed defense counsel privately that no weapons were found at the scene of the crime. And in his per curiam to Bill No. 19 the judge explained that, during the hearing on the motion to suppress the evidence, appellants were informed by the testimony of the officers of the circumstances under which they (appellants) were identified—viz., that they were identified by a person (Keesler) who was present at a meeting with appellants after the crime has been committed at which time appellants admitted their guilt; that, during the hearing on the motion to suppress, appellants were also apprised of the oral confessions which they had given the police; and that, on the trial of the case, it was developed that there were no incriminating statements which had been reduced to writing but not signed. The record in the case, stated the judge, also reveals that the defense of appellants was an alibi—that they each took the stand and claimed to be somewhere else at the time the crime was committed.

▬▬ We find the judge's per curiam to be supported by the record and that he did not err in his ruling on Bills 1 and 19. It is well settled that the State is not required in a bill of particulars to set out in detail the evidence on which the prosecution will rely to obtain a conviction. State v. Pailet, 246 La. 483, 165 So.2d 294; and State v. Clack, 254 La. 61, 222 So.2d 857. It suffices that the accused is to be given adequate information to fairly defend himself. Moreover, it is established that, in response to a prayer for

oyer, the State is only expected to furnish an accused with his written or video tape confession. Pretrial inspection of oral confessions, police reports and the like is not required. State v. Hunter, 250 La. 295, 195 So.2d 273; and State v. Hall, 253 La. 425, 218 So.2d 320. In the instant matter the appellants were furnished with all the information the law requires; consequently, Bills Nos. 1 and 19 are without merit.

■ The same result obtains with respect to Bill No. 12 which was taken to the introduction of the proces verbal of the Coroner's office identified by Dr. Medina, stating the cause of death of the victim. This bill, as above indicated, was founded on the alleged error of the judge in refusing to require the State to produce the proces verbal of the Coroner prior to trial. The short answer to the proposition is that the Coroner's autopsy report is a public record open to pre-trial inspection and hence was available to defense counsel at all times.

### BILL OF EXCEPTIONS NO. 2

While Sergeant Fields of the New Orleans Police Force was testifying on the hearing of the motion to suppress the confessions, he was asked on cross-examination to furnish the name of the informant who had contacted him on the day of appellants' arrest and said that there was someone (Keesler) who wanted to talk to the police about the death of McLaurin. The State objected on the ground that the person who gave the police information regarding the perpetrators of the crime had already been identified as Keesler and, hence, the name of the informant who set up the interview was irrelevant. When the trial court sustained the State's objection, Bill No. 2 was taken.

■ The bill has no substance. The unnamed informant knew nothing about McLaurin's murder; he merely arranged the meeting between Officer Fields and Keesler from whom the information which led to appellants' arrest was obtained. Therefore, the name of the informer was without relevance to the case.

### BILLS OF EXCEPTIONS NOS. 3, 5, 15, 16 and 17

These bills concern the written and oral confessions of appellants and certain incriminating acts which they performed in the presence of the police.

During the trial the State introduced an oral statement by Purkey and his written confession; a confrontation between Purkey and Cripps in which both made incriminating statements, a photograph showing Purkey demonstrating the death hold he had used to break McLaurin's neck, a picture of McLaurin signed by Purkey, and an oral statement by Cripps and his written confession. Bills 3 and 5 were taken by appellants when the judge prior to trial

denied the motion to suppress the confessions. Bill 15 was reserved during the trial when the judge, over objection, admitted all the confessions, both oral and written, into evidence. Bill 16 relates to the admission in evidence of Exhibit S–13, Cripps' Rights of Arrestee and Waiver Form, and S–14, Cripps' written confession. Bill 17 involves Exhibit S–5, a photograph of McLaurin which was shown to Purkey on the night of the arrest and which was signed by him and identified as being a picture of the man he had killed; S–15, a photograph of Purkey taken on the night of his arrest demonstrating the hold he had used to kill McLaurin; S–16, Purkey's Rights of Arrestee and Waiver Form; and S–17, Purkey's written confession.

Defense counsel maintain in their motion to suppress evidence that appellants' statements and confessions were obtained from them during a period of illegal detention, in that they were arrested without a warrant and without probable cause to justify a warrantless arrest. It is argued that the only basis for appellants' arrest on March 12, 1968 was the uncorroborated information given to the police by James Keesler that appellants admitted to him at a spaghetti party held on March 1 on Dumaine Street that appellants were involved in the death of McLaurin. Counsel proclaim that, since the warrantless arrests of March 12, 1968 were illegal, any

statements or confessions obtained from them occurred during a period of unlawful detention and, hence, should have been declared inadmissible on their trial. In support of their position, counsel cite Wong Sun v. United States, 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963).

■ We perceive no merit whatever in these propositions. In our view the arrest of appellants was lawful in every respect. The Wong Sun case relied on bears no resemblance to the matter at hand. As we have shown in this opinion and, as pointed out by the trial judge in his excellent per curiam to these bills, the police were well aware that a homicide had been committed and were investigating to determine the identity of the culprits. Pursuant thereto, it was proper for them to arrest appellants upon receiving information from Keesler of the nature revealed by this record.

On March 12 an informer contacted Sergeant Fields and volunteered that he knew someone who had information to give the police about the death of McLaurin. That same evening, by arrangement with the informer, Fields met Keesler, who told Fields regarding the dinner on Dumaine Street and of the statements made by Cripps—that, a few days before, he, Purkey and Boudreau had met a "guy" at the China Doll Lounge, had taken him out, rolled him and killed him by snapping

his head and had thrown his body in the City Park Lagoon. This information and other information shown by the record, which is unnecessary to relate, provided the officers with probable cause to make the arrests without a warrant. Article 213 of the Code of Criminal Procedure provides that a peace officer may without a warrant make an arrest when:

"* * * (3) The peace officer has reasonable cause to believe that the person to be arrested has committed an offense although not in the presence of the officer; * * *."

Under the facts of this case, it can hardly be doubted that the officers had reasonable cause within the intent of the statute.

Defense counsel also argue that all inculpatory statements and confessions given by appellants after their arrests should have been suppressed because they were obtained before appellants were brought before a magistrate in contravention of Article 232 of the Code of Criminal Procedure; that the statements were also obtained in contravention of Article 230 C.Cr. P. in that appellants were never advised of their right "to communicate with anyone and/or legal counsel by the use of a telephone"; that the statements were secured by intense police questioning, coupled with duress and bodily harm inflicted by the police, and that appellants were not adequately warned of their right to counsel.

We find no substance in the legal propositions urged by counsel and their factual contentions (which are not argued) are contrary to the clear preponderating evidence contained in the record.

Article 232 C.Cr.P. is without relevance to the case. The article pertains only to arrests by officers of another state who are permitted by Article 231 to make arrests in close pursuit of persons who are escaping from arrest for felonies committed in another state.

■ Article 230 C.Cr.P. merely provides that an arrested person has the right to procure counsel and to use a telephone or send a messenger for the purpose of communicating with counsel and his friends. Appellants were given the Miranda warnings and were fully informed of their rights in this case. They had the statutory right to use a telephone, had such a request been made. But they made no request. The specious argument seems to be that the police should have particularly informed them of such right and failure to do so renders the confessions tainted. However, the statute does not require this and neither does the Miranda decision.[1]

1. We assume the framers of the Miranda bill of rights must have believed the use of the telephone to be so commonplace in this country that even the most ig-

■ Coming now to the question of whether the inculpatory statements and confessions were free and voluntary, the evidence of the police officers, as we have already indicated, is convincing and clearly preponderates over the appellants' statements that they were beaten and subjected to intimidation and force. The district judge, who saw the witnesses and heard them testify, wrote a comprehensive per curiam detailing the evidence and it would serve no useful purpose to repeat it here. Suffice it to say that the admissibility in evidence of a confession is for the trial court; its weight is for the jury; and it is the settled jurisprudence of this Court that the conclusion of the trial judge respecting the testimony on the giving of a confession involves a question of fact and will not be disturbed on appeal unless it is not supported by the evidence. See State v. Lacoste, 256 La. 697, 237 So. 2d 871 (1970) and authorities there cited.

## BILL OF EXCEPTIONS NO. 4

This bill was taken when the trial judge overruled two motions filed by appellants to quash the indictment.

■ In one of the motions, appellants complain because they were denied pre-trial discovery, a contention previously raised and disposed of adversely to them in connection with Bill No. 1. However, they also allege that imposition of the death penalty for murder is cruel and unusual punishment violative of the State and Federal Constitutions.

This contention is devoid of merit so far as this Court is concerned. In State v. Crook, 253 La. 961, 221 So.2d 473 (1969), we concluded, in disposing of a similar plea involving aggravated rape, that the constitutional prohibition against cruel and unusual punishment refers to those punishments that are "barbarous" and "extraordinary" and shock the conscience of civilized man; that electrocution is a common method of administering the death penalty, and that " * * * its constitutionality has been consistently upheld." (Citing cases decided by the United States Supreme Court)

■ Defense counsel, however, reminding us that this very issue is now pending before the United States Supreme Court in Davis v. Arkansas, 403 U.S. 954, 91 S. Ct. 2273, 29 L.Ed.2d 865, request that we defer our ruling in this matter until that case is decided. This we will not do. It is not the policy of this Court to postpone

---

norant arrestee, having been informed of his rights and desiring to communicate with counsel or friends, could make a simple request for such use. At any rate, Article 230 C.Cr.P. does not require the custodian of the arrestee to in-

form the latter of his right to use the telephone and this Court is not inclined to amend the statute in this respect believing that this is within the sphere of legislative action.

judgment in cases submitted for decision until action is taken by the highest court in the land on matters of a similar nature. Particularly is this true when, as here, the high court has rejected the contention sought for in its prior jurisprudence. The change, if one is to be made, must essentially rest with those who have the power and the will to do so.

In the second motion to quash the indictment, it is asserted that Article 413 C.Cr.P., prescribing the method for impaneling a Grand Jury in Orleans Parish, is unconstitutional in that it permits the judge to select twelve persons from the Grand Jury Venire of seventy-five persons (who had been drawn by lot) instead of having the jury chosen by lot (from a selected list) as is done in the other Louisiana parishes.

Additionally, it is claimed that Article 413 C.Cr.P. is unconstitutionally applied in Orleans Parish because it "enables the Court to exclude persons representing a true cross-section of the community in that members of the working class, laborers and daily wage earners are traditionally and historically excluded from service on the Grand Jury." In support of this contention, counsel cite Labat v. Bennett, 365 F. 2d 698, 5th Cir. (1966).

These postulations are untenable. In State v. Rue, 236 La. 451, 107 So.2d 702 (1958), we held that statutes regulating the impaneling of grand juries in Orleans Parish, R.S. 15:196 and 197, now Article 413 of the Code of Criminal Procedure, do not violate either the Louisiana or United States Constitution notwithstanding that they differ from the statutory methods of selecting grand juries in other Louisiana Parishes.[2]

The contention that Article 413 is unconstitutionally applied in Orleans Parish in that members of the working class, laborers and daily wage earners have been traditionally excluded from grand juries in that parish is not supported by proof. On the contrary, the only evidence offered by appellants to establish their claim of discrimination is the testimony of Judge Matthew Braniff, who selected and impaneled the grand jury which indicted appellants. The judge stated that he interviewed each of the one hundred men composing the Grand Jury Venire

---

2. The Court declared:
 "As to the second ground of attack upon the constitutionality of the statutory method of selection of grand juries in Orleans Parish, we are cited to no provision of the State or Federal constitutions which prevents our legislature from providing as it has done a different method of jury selection for the metropolitan area of Orleans Parish than for the other parishes of the State, and we fail to see how defendant-appellant has been prejudiced by or has ground to complain of such historic differentiation."

furnished him by the jury commission from the. wheel (by lot) and that he selected the first twelve men who, in his opinion, were qualified to serve as grand jurymen. He also asserted that he attempted to get a cross section of the community on the Grand Jury; that he did not exclude anyone who might be considered a member of the laboring class for that reason alone and that some of the members of the jury were wage earners.

■■ The burden rested on appellants to establish discrimination in the selection of the jury. State v. Barksdale, 247 La. 198, 170 So.2d 374 (1965). No such evidence was offered by appellants and we find absolutely no ground for complaint. Furthermore, the law and jurisprudence is well settled that a general venire, a grand jury venire or petit jury venire " * * * shall not be set aside for any reason unless fraud has been practiced or some great wrong committed that would work irreparable injury to the defendant." Article 419 C.Cr.P. And see State v. Murphy, 234

La. 909, 102 So.2d 61 (1958), cert. den. 357 U.S. 930, 78 S.Ct. 1376, 2 L.Ed.2d 1373 (1958).[3]

In connection with this bill we note that during oral argument it was stated from the Bench that, since Judge Braniff selected the members of the Grand Jury in his chambers rather than in open court, such procedure may well be regarded as illegal.

■■ We cannot accept this view. Initially, we know of no law requiring a judge to select members of a grand jury in open court and perceive no reason why the interviews with and choice of the grand jurors in chambers is not equally effective legally. No doubt when a judge acts in chambers, anent duties provided by law, he does so in his official capacity. This being so, the maxim "omnia presumuntur rita esse acta" applies. In any case, even if the selection of jurors in chambers were to be regarded as irregular, such irregularity would not furnish grounds for quashing an indictment under our law.

3. The case of Labat v. Bennett, 365 F.2d 698, 5th Cir. (1966), is totally inapposite here. That case involved discrimination against Negroes in the selection of juries in Orleans Parish prior to the Eubanks decision in 1958. (Eubanks v. State of Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991.) The appellants herein are white and claim no racial discrimination. An accused is not entitled under the equal protection clause to be indicted by a grand jury containing members of his own race or of the same class of society with which he is identified, or who earn their livelihood by a per hour wage, or by the month or year. The sole requisite, as we appreciate the United States Supreme Court decisions, is that the jury be selected without any systematic inclusion or exclusion of members of a particular race, and that it is only when it appears that the method of jury selection operates so as to continually result in the complete exclusion of Negroes or other racial group that indictments returned against a member of such group cannot stand. State v. Vernon, 251 La. 1099, 208 So.2d 690.

For, we repeat that, under Article 419 C.Cr.P., no jury venire, general, grand or petit, may be set aside for any reason unless fraud has been practiced or some great wrong committed from which the accused suffers irreparable injury. See State v. Rue, supra.

### BILLS OF EXCEPTIONS NOS. 6, 7, 8, 9 and 10

These five bills, which are neither briefed nor argued by defense counsel, were taken when the trial court, on motion of the State, excused for cause eight jurors on the ground that they were unalterably opposed to capital punishment. The basis of the objection is that the questions propounded by the State did not satisfy the principles set forth in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

 We find no basis for any of these bills. Three of the prospective jurors stated that they could not under any circumstances whatsoever " * * * return a verdict of guilty as charged, which means the electric chair." Another venireman stated that no matter how strong the proof, and what the facts of the case were, he could not return a verdict of guilty as charged. Three others, when asked the same question, stated they could not return a verdict of guilty as charged no matter what the evidence showed. Finally, another venireman, when asked if he would automatically vote against the imposition of capital punishment without regard to the evidence that might be developed at the trial, stated, "That's correct."

The challenges for cause were properly sustained and were not violative of the Witherspoon decision. See State v. Poland, 255 La. 746, 232 So.2d 499 (1970).

### BILL OF EXCEPTIONS NO. 11

 This bill, which is neither argued nor briefed by appellants, was reserved when the trial court, over defense counsel's objection, permitted the prosecuting attorney to ask a prospective juror on voir dire examination, "Do you have any pressing personal or business matters, Mr. Krause, which in any way would deprive you of giving your full attention to this case?"

The bill is frivolous. Voir dire examination of prospective jurors is a matter within the sound discretion of the trial court. Defense counsel did not assign any reason for the objection and we know of none.

### BILL OF EXCEPTIONS NO. 13

 This bill, which is neither argued nor briefed, was reserved when the trial judge, over defense counsel's objection, permitted two photographs to be offered in evidence by the State. In his per curiam to the bill the trial judge ex-

plains that he allowed one photograph to be admitted because it depicted the body of the victim floating in the City Park Lagoon and that it was relevant to show the scene of the murder. The other photograph shows a close-up of the body of the victim floating in the Lagoon next to the boat with the oar, which one of the young men who discovered the body, used to bring it in to shore. It was likewise admissible in that it corroborated various facts brought out during the trial, for example, the fact that McLaurin's glasses were placed back of his face before he was thrown into the Lagoon. The bill is without substance.

## BILL OF EXCEPTIONS NO. 14

■ After the State had rested, following the laying of the predicate for the reception of appellants' confessions in evidence, defense counsel offered the testimony of each defendant before the jury solely for the purpose of showing the circumstances surrounding the obtaining of the confessions. The State objected to the appellants taking the stand for this limited purpose on the ground that, under the law, if they took the stand the State should be able to cross-examine them on the entire case. The judge sustained the State's position and, when he did so, counsel reserved Bill No. 14.

■ The complaint is without foundation. R.S. 15:462 declares that, when a person accused becomes a witness, he shall be subject to all of the rules that apply to other witnesses " * * * and may be cross-examined upon the whole case." See State v. Goins, 232 La. 238, 94 So.2d 244 (1957). It is well established in all jurisdictions that an accused who testifies in his own behalf waives completely his privilege under the Fifth Amendment and no person is entitled to insist on a partial waiver of his constitutional rights. Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926).

## BILL OF EXCEPTIONS NO. 18

■ When the defense rested its case about 8:40 on the night of the trial, counsel for appellant Cripps, while in the judge's chambers and outside the presence of the jury, moved for a recess to be called until the following morning, asserting that he was tired and wanted to prepare his argument. When the motion was denied this bill was reserved.

The minutes reveal that the State rested its case at 8:55 p. m.; that the jury began its deliberations at 10:30 p. m. and returned with their verdict at 11:25 p. m.

We find no merit in this bill. Under Article 712 of the Code of Criminal Procedure the granting or refusing of a recess or continuance is within the sound discretion of the trial judge. It does not appear that the judge abused his discretion in the

instant case in refusing the motion for a recess.

The convictions and sentences are affirmed.

BARHAM, Justice (concurring).

I concur in the result reached under Bill of Exception No. 4, there being no showing of prejudice to the defendants under that bill. However, if the judge did in fact select the grand jury privately, then I do not believe this court should condone such action. The selection and empaneling of a grand jury not only are entitled to, but require, an open court proceeding. Under Code of Criminal Procedure Article 412, potential grand jurors in Orleans Parish are subpoenaed to appear "in court". Comment (b) under Article 413 states that the only significant procedural difference between Orleans Parish and the other parishes in empaneling grand juries is that in Orleans jurors are selected from the grand jury venire by the judge and in other parishes are drawn by lot from the grand jury venire.

Unless otherwise statutorily directed, court proceedings anticipate open court proceedings. Summary and "in chambers" proceedings are exceptions rather than the rule. We do not look for statutory *restrictions* against proceedings in chambers but must look for statutory authority for them. There is no authority for proceedings in chambers in the selection of grand jurors,

and we are required to demand that the usual court procedures be followed. Grand jurors should be selected and empaneled in open court with all the proper officers in attendance and with the transaction fully spread upon the minutes of the open court proceeding.

I cannot join in this court's sanctioning of "executive sessions" for the empaneling of the grand jurors of this state. I respectfully concur.