370 So.2d 539 (1979)
STATE of Louisiana
v.
Norman P. BILLIOT.
No. 62722.
Supreme Court of Louisiana.
April 9, 1979.
*541 John L. Carroll, Montgomery, Ala., Cleveland J. Marcel, Houma, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Norval J. Rhodes, Dist. Atty., James L. Alcock, Asst. Dist. Atty., for plaintiff-appellee.
SUMMERS, Chief Justice.[*]
The Grand Jury of Terrebonne Parish charged Norman P. Billiot with the first degree murder on November 13, 1975, of Herbert Charles "Irby" Bergeron. After trial by a jury of twelve he was found guilty as charged and sentenced to imprisonment at hard labor for life, without benefit of probation, parole or suspension of sentence for 40 years. See State v. Lee, 340 So.2d 180 (La.1976).
This appeal presents four issues based upon eight assignments of error.
About 5 o'clock on the morning of November 13, 1975 defendant Norman Billiot called a Yellow Cab from the Brown Derby Lounge located on Bayou Blue in Lafourche Parish. Herbert "Irby" Bergeron, a Yellow Cab driver, responded to the call. After ascertaining that the fare would be $17.00, Billiot instructed him to drive towards his friend's house near Cocodrie in Terrebonne Parish. When they arrived at the Texaco dock near Cocodrie, Billiot inquired of the dispatcher there if he had heard from the vessel Janice C. No communication having been received, Billiot returned to the cab and instructed Bergeron to drive to Grand Caillou.
En route they turned onto the Bayou Salle road, and when they had traveled about five miles, Billiot told the driver that he didn't have enough money to pay him. Because he didn't have the money, the cab driver told Billiot that he would have to drive him back to the Texaco dock and drop him. Apparently angered by the cab driver's attitude, Billiot pulled a small dagger from his pocket, and demanded the driver's money. When the driver tried to hit him, Billiot cut himself with the dagger. In the scuffle that ensued Billiot cut the cab driver a number of times, finally pulling him from the cab and stabbing him in the chest.
Billiot then pulled the driver into the weeds and removed the driver's clothes to replace his own which were soiled. Finding the driver's clothes were also soiled he *542 abandoned him in the weeds, took the cab and headed toward Bayou Dularge in Terrebonne Parish, on the way throwing the knife on the side of the road. At his destination he abandoned the cab on an isolated side road, removed the cab driver's money from a small box on the floor of the cab and ran to the highway. He was picked up by his brother Lawrence shortly thereafter, rode home and went to bed.
Later that morning the family of Bergeron filed a missing persons report with the authorities of Terrebonne Parish. He had last been seen in the early morning hours of that day by his son. That afternoon policemen discovered his cab where Billiot had abandoned it. Blood in the cab, an empty knife scabbard in the back seat, and the cab driver's rifled money box suggested the obvious probability of foul play.
Investigators learned that Billiot had been Bergeron's last known fare. Two sheriff's deputies were dispatched to Billiot's residence in Dulac. They brought him back to the Sheriff's Office in Houma for questioning. After interrogation he confessed to killing Bergeron, and led the investigators to the site where he had concealed Bergeron's body in the weeds. The victim had been stabbed repeatedly.

I.
The defense contends in Assignments 1, 2 and 3 that the trial judge erred in denying its motions to suppress evidence of Billiot's confession and his clothing worn at the time of the murder.
Chief of Detectives Aubrey Authement was in charge of the investigation. He learned that Bergeron was missing and Billiot was the last person seen with him. When the abandoned cab was discovered and inside were found traces of blood, a knife scabbard, and a rifled money box, Authement dispatched Detectives Buquet and Fitzgerald, who knew Billiot, to locate him at his residence.
The detectives, out of uniform and in an unmarked vehicle, proceeded to defendant's residence at Dulac. Upon arrival their knock at the front door was answered by defendant's mother. They informed her that they would like to speak to Norman. When she summoned him Billiot appeared at the door dressed only in trousers. They informed him that they understood that he was the last person seen with Bergeron and asked if he would object to coming to Houma; they wanted to talk to him. Billiot said "o. k.", but said he couldn't remember very much because he drank a lot the night before.
While still at the doorway of Billiot's house, the officers suggested to Billiot that he would need a shirt and shoes, whereupon Billiot started into the house and the officers asked if they could accompany him. Billiot agreed and as they proceeded to his bedroom, he was asked if he would bring the clothes he wore the night before. In his bedroom, while donning his shirt, Billiot handed a pair of trousers and a shirt to Buquet, after removing personal effects, including some money, from the pants pockets.
The detectives and Billiot then promptly departed and entered the sheriff's vehicle parked nearby. At that time Billiot was read his Miranda rights from a card by Buquet, and they drove off. The entire encounter took no more than ten minutes.
Upon arrival at the sheriff's office, Billiot was escorted to the detective bureau by Chief of Detectives Authement. After seating him at a desk, Authement again advised him of his Miranda rights. An interrogation followed for approximately fifteen minutes in which Billiot admitted that he had taken a cab ride the night before, that he knew Bergeron, but that he had not killed him. At that time Billiot saw officer Mike Eisner nearby. Apparently Billiot knew Eisner and said, "Mike, I want to talk to you."
Elsner, Billiot and Authement then went into Authement's office where Billiot was again given the Miranda warning by Elsner. Thereafter Elsner questioned Billiot, and Billiot recounted the events of the early morning cab ride, the fight with Bergeron and his stabbing of the victim. Asked if he *543 knew whether Bergeron was dead, Billiot said he did not. Whereupon Elsner suggested that Bergeron might still be alive and the only way to find out was to go to the site. Billiot then offered to take them there.
Billiot was handcuffed and embarked in a police vehicle with Elsner and Authement and they headed toward the site. Billiot led them to the scene of the stabbing where the victim's body lay. The coroner was summoned. After spending about an hour at the scene Billiot was returned to the lockup where he was booked. He then gave a statement to Authement in Elsner's presence at the detective bureau after having been again read his Miranda rights. Authement typed the statement which Billiot signed in the presence of Authement and Elsner.
Defendant contends that he was arrested without warrant and that the search and seizure of his clothing which followed and the confession and evidence obtained as a result of his subsequent detention and interrogation were obtained in violation of the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States and Article I, Sections 3, 13 and 16 of the Louisiana Constitution.
It is the defense contention that Billiot was arrested from the moment Buquet and Fitzgerald spoke with him on the porch of his residence in Dulac. On this premise the defense asserts that the holding in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), requires that defendant's oral and written confessions, and his clothing surrendered to the detectives at his house were tainted by the prior illegality and were therefore inadmissible as evidence at trial.
An arrest is the taking of one person into custody by another. To constitute an arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him. La.Code Crim.Pro. art. 201.
The constitution prohibits seizure of persons or effects except upon a warrant issued on probable cause by oath or affirmation, describing the person to be seized. La.Const. art. I, § 5 (1974).
However, a peace officer may, without a warrant, arrest a person when the peace officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer. La.Code Crim.Pro. art. 213.
Probable cause exists when the facts and circumstances known to the arresting officer, and of which he has reasonably trustworthy information, are sufficient to justify a person of ordinary caution in believing that the person to be arrested has committed a crime. State v. Davis, 357 So.2d 519 (La.1978); State v. Dunbar, 356 So.2d 956 (La.1978); State v. Johnson, 249 La. 950, 192 So.2d 135 (1966). To determine the existence of probable cause, the court must examine the "`facts and circumstances within the arresting officer's knowledge, and of which he has reasonably trustworthy information;'" State v. Linkletter, 345 So.2d 452 (La.1977); and do so in light of the experience of reasonable people, not legal technicians. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Probable cause is not absolute cause. Actions of lawmen, therefore, may be supported by less evidence than would justify a conviction. The strength of the requisite probable cause varies with the magnitude of the intrusion and the alternatives available to the peace officer. In the first instance the determination of probable cause is a matter for the trial judge depending, as it often does, upon factual determinations and the credibility of witnesses.
No arrest occurred when the officers knocked on Billiot's door and requested permission to see him. No arrest occurred when they told him that they understood he was the last person to see the missing cab driver and asked him to come with them to Houma because they wanted to talk to him. He consented of his own free will to accompany them, stating that he didn't remember too much because he had been drinking. *544 No violation of his privacy occurred when they requested and were given permission to accompany him into the house. No seizure occurred when they asked for the clothes he wore during the cab ride and were handed the trousers and shirt.
The officers were in plain clothes, displayed no gun or handcuffs and never declared Billiot to be under arrest. They did not restrain him by laying of hands or otherwise. No force, coercion or intimidation was used. Billiot entered the vehicle willingly and without protest. At that point, though not then under formal arrest, his detention may have been said to constitute a constructive arrest. To justify this detention the officers must have had probable cause to detain Billiot.
This probable cause existed. The officers involved in the investigation knew that the victim Bergeron had been reported missing, they were aware that Billiot was the last person seen with Bergeron in his cab, and the cab was found abandoned several hours later in an isolated location. Bloodstains, a dagger sheath and the rifled money box were found in the cab. These facts and circumstances led to the reasonable conclusion that an offense had been committed. It was the obvious, logical and reasonable next step for the officers to question Billiot. They proceeded to do so in a cool and inoffensive manner, without force or intimidation and with the full consent and approval of Billiot.
As to the confession, this Court has repeatedly held that
"[b]efore a confession can be introduced in evidence, the state has the burden of affirmatively proving that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La.R.S. 15:451; La.Code Crim.P. art. 703(C). It must also be established that an accused who makes a confession during custodial interrogation was first advised of his Miranda rights." State v. Adams, 347 So.2d 195 (La.1977).
At the hearing, the defense presented no serious challenge to the State's proof on either ground. Its brief makes no concerted effort on that subject. It does however rely upon the decision in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), for the proposition that when a confession is secured as the result of an accused's illegal detention, the State bears the burden of proving that intervening circumstances have purged the taint of the prior illegality.
This argument is dependent upon whether defendant was under an illegal arrest at the time of his first confession. If no such illegality occurred no taint need be dispelled, and the confession must stand or fall upon its voluntariness, and the proper Miranda warnings. Our findings on this point are that Billiot's arrest and detention were based upon probable cause. Thus, when the Miranda warnings were properly given and the confession was free and voluntary, as the recitation of facts disclose that it was, admissibility is permissible.

II.
By Assignments 4 and 5 the defendant contends that the trial judge erred when he denied defendant's motion to quash the indictment against him and denied defendant's challenge to the petit jury because of the systematic exclusion of Indians from grand juries and petit jury rolls.
Defendant Billiot is registered as a white male, a determination made by him at the time of his voter registration. He professes, however, to belong to the race of Houma Indians.
Prior to trial, the defense moved to quash the petit jury venires for, among other reasons, the systematic exclusion of Indians.
The United States Court of Appeals for the Tenth Circuit has announced a test to determine whether a group which a challenger has alleged to be unrepresented is cognizable, cognizability of the group being an essential element in proving discrimination. United States v. Test, 550 F.2d 577 (10th Cir. 1976). That test is as follows:
"(1) the presence of some quality or attribute which `defines and limits' the *545 group; (2) a cohesiveness of `attitudes or ideas or experience' which distinguishes the group from the general social milieu; and (3) a `community of interest' which may not be represented by other segments of society." 550 F.2d at 591.
In an effort to establish that the Houma Indians are a "cognizable" group within Terrebonne Parish, the defense adduced evidence at a hearing on the motion that the venires in Terrebonne and Lafourche Parishes are drawn from the lists of registered voters, as supplemented each month. Except for the persons the jury commissioner knows have moved out of the parish, or died, the names are then placed in a large drum. From this drum, three thousand names are then selected at random. These names then constitute the general venire, from which the grand and petit jury venires are drawn, again at random, and as needed. The general venire is periodically supplemented to keep the number of names constant.
In order to prove systematic exclusion of Indians by this system, counsel first sought to prove that Indians represent an identifiable class within the district. To that end he called Professor Forrest Deseran, a professor of sociology at Louisiana State University. He testified that the 1970 census for Terrebonne Parish had identified a population of 2,265 Indians out of a total population of 76,000, roughly a 4% Figure. (It is actually about 2.98%). His own sociological study conducted with local interviewers yielded the same result. His study disclosed that the Indians have been assimilated culturally. Nonetheless, he said, "there is a definite knowledge amongst the people that live there that there is a differentiation between the Indians, black and white population," and that, therefore, ". . . the social impact or social definition of the Indian is very real . . . ."
According to the Registrar of Voters of the total population in the district, 36,000 are registered voters. Because that office included Indians as Whites on its rolls it was impossible to determine, at least from those lists, how many Indians in the district had registered. Notwithstanding this practice, from checking the original registration cards of the general venires for 1975 and 1976, she provided the following percentage figures: .9% in 1976; .6% in 1975.
From these statistics the defense argues that an evident statistical disparity exists between the 3% ratio of Indians to the general population and a .6 or .9% ratio to the general venire. The defense claims this showing established a prima facie case of systematic exclusion. And, as the State offered no evidence to rebut this showing, apart from protestations of fairness on the part of the jury commissioners, the defense contends the trial judge erred in denying the motion.
As the defense figures proved, Indians have not been totally excluded from the jury venires in the parish of Terrebonne. The State's brief argues that Professor Deseran's study that Houma Indians constitute a distinct class is not well-founded. Classification by race in Deseran's study turned on the interviewer's evaluation alone, the State argues, and did not compensate for racial intermarriage. In addition, the State argues, the testimony at the hearing makes clear that Indians often register as whites. To this extent, therefore, the statistical base for supporting cognizability of the group is extremely suspect.
The defense position is further weakened by Deseran's conclusion that while Indians do constitute an identifiable social class, the group is small.
Here we have a finding of a small, if identifiable and possibly cognizable group, and the fact that some Indians do serve on jury venires. However, a further showing of systematic and purposeful exclusion of Indians is required. The uncontradicted testimony of the jury commission was to the effect that no conscious or subconscious effort was made to exclude any prospective juror from being included on the parish's jury venires. The jury selection procedure was randomly accomplished without reference to race. No documents used by the commissioners specified the race of the prospective juror. The procedure was totally *546 colorblind and evenhanded. A fair cross section of the community was represented on the challenged juries. No evidence was presented to contradict this clear showing.
The law of this State is designed to prevent unfounded attacks upon venires resulting from good faith efforts by jury commissions to comply with legal requirements for selecting juries. Thus the Legislature has declared that "[a] general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced or some great wrong committed that would work irreparable injury to the defendant." La.Code Crim.Pro. art. 419. There is a considerable body of jurisprudence supporting this legislation. See State v. Sheppard, 350 So.2d 615 (La.1977); State v. Fletcher, 341 So.2d 340 (La.1976); State v. Anderson, 315 So.2d 266 (La.1975); and the many cases cited in these opinions; State v. Monk, 315 So.2d 727 (La.1975); State v. Cripps, 259 La. 403, 250 So.2d 382 (1971). There is, therefore, no merit to these assignments of error.

III.
At some time during his incarceration, appellant wrote a lengthy, discursive autobiography. The handwritten document chronicled Billiot's life from birth until his incarceration for the instant offense. It was sent to his attorney who forwarded it to Dr. Maxwell Weisman for the psychiatrist's use in preparing his testimony for Billiot's trial involving the nature of alcoholism and its effect upon alcoholics. Much of Billiot's autobiography detailed Billiot's problems with drinking.
At the conclusion of Dr. Weisman's testimony, the defense offered the autobiography in evidence, and it was received by the Court. No attempt was made by defense counsel to submit the document to the jury.
The jury retired at the close of the case. After deliberating about one hour, they returned to the courtroom and made certain requests of the trial judge, including permission to review Billiot's autobiography. After a bench conference, the judge informed the jury that at this juncture of the trial he was not permitted to allow them to read the autobiography. He relied upon Article 793 of the Code of Criminal Procedure to this effect:
"A juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict."
Billiot's counsel then requested another bench conference. At the conclusion of this conference, the court instructed the jury that denying them the right to read the autobiography was a matter of total inadvertence. They were further instructed that no evidence was deliberately withheld from them, and that they were not to draw any adverse inference because their request was denied. Defense counsel then indicated that he was totally satisfied with that instruction and the court went on to other matters.
Because no contemporaneous objection was made to the ruling of the trial judge the issue is not properly before this Court on appeal. La.Code Crim.Pro. Arts. 841 and 920. See also State v. Passman, 345 So.2d 874 (La.1977); State v. Freetime, 303 So.2d 487 (La.1974).
Notwithstanding the absence of a timely objection the defense contends that, as applied in this case, Article 793 of the Code of Criminal Procedure operated to deny him due process of law guaranteed by the United States and Louisiana Constitutions. Fundamental fairness was denied here, according to the defense, because crucial evidence to the guilt determination and to mitigation was denied to the jury.
The contention lacks merit. Defendant was permitted wide latitude in the direct examination of its witnesses on the subject of Billiot's alcoholism. Dr. Weisman testified to Billiot's protracted and heavy use of *547 alcohol. In that opinion, more than in Billiot's self-serving history, lay the greatest hope of the defense for establishing lack of specific intent to murder. For that reason, Assignments 6 and 7 lack merit.

IV.
By Assignment 8 defense counsel argues that his failure to timely object to the ruling of the trial judge denying the jury access to the autobiography, and his failure to present the autobiography to the jury when it was introduced into evidence amounted to, in the context of this trial, ineffective assistance of counsel.
If these factors were inadvertent oversights of counsel his defense of Billiot was not ineffective. His omission was not a critical, or even significant, one in light of testimony from the expert witness. Counsel otherwise litigated the case with obvious expertise and competence.
This assignment lacks merit.
For the reasons assigned, the conviction and sentence are affirmed.
NOTES
[*] Judge Cecil C. Cutrer participated in this decision as Associate Justice Ad Hoc sitting in the place of Justice Marcus.