STOKER, Judge.
The defendant, Austin James Green, was convicted, after trial by jury, of second degree murder in violation of LSA-R.S. 14:30.1 and armed robbery in violation of LSA-R.S. 14:64. The defendant was sentenced to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence for the murder conviction, and 40 years at hard labor without benefit of parole, probation or suspension of sentence for the armed robbery, the sentences to run concurrently. The defendant has appealed these convictions and has raised eight assignments of error. Assignment of error number 6 was not briefed and is therefore considered abandoned.
FACTS
On March 7, 1985 the victim, George Carter, returned from his offshore job to his home in Opelousas. He was dropped off at his home by his neighbor and coworker, J.C. Ned, at approximately 1:45 p.m. After depositing his belongings in the house and calling his wife, who was out of town, Carter got into his blue and white Ford pickup truck and left. Carter apparently went directly to a nearby lounge, the Sherrelle, where he played pool and drank some beer. The defendant was at the Sherrelle with a friend, Earl King. King and Carter played pool together until King decided to turn his stick over to the defendant. King prepared to leave the lounge a short time later and offered the defendant a ride home. Defendant declined because Carter said that he would take him home. The defendant and Carter left the bar together later that afternoon. Carter’s body was discovered in a bayou near Grand Co-teau the next day, Friday, March 8, 1985. The body had no identification on it when recovered.
Carter’s body revealed multiple stab wounds to the neck, chest, abdomen and back. His body was released to the Iber-ville Parish coroner’s office for an autopsy The following day, Lafayette police discovered Carter’s pickup truck in the parking lot of the University Medical Center. The truck had blood on the inside and outside.
The St. Landry Parish Sheriff’s Department began its investigation of the crime. Sherry Ned, J.C. Ned’s wife, told deputies that on the afternoon of March 7, 1985 she had seen Carter with a tall black man without bushy hair traveling in his truck on the Airport Road in Opelousas. She did not see the passenger’s face. Carter and the *268 defendant were seen next at the home of Carter’s neighbor, Clayton Thomas, at approximately 4:15 p.m. The Thomases had been collecting the Carters’ mail while Mr. and Mrs. Carter were out of town. Carter stopped by to pick up his mail and conversed briefly with some of the Thomas children. These children told deputies that a tall black -man wearing a “bee-bop” cap was with Carter, but he did not get out of the truck or speak to anyone. David Thomas told deputies that he was passing Guidry’s grocery and carwash at 7:00 or 8:00 p.m. on March 7 when he noticed Carter’s pickup truck parked at the carwash. He recognized it as the victim’s truck because of a dent in the front fender. Thomas turned into the carwash and noticed two men near the truck, neither of whom was Carter. He approached the two men, one of whom he knew only as “Poopie,” and inquired about Carter. Thomas was told by “Poopie” that Carter was “taking care of business.” Thomas then left.
Detective Scott Perry went to the Opel-ousas Police Department to try to ascertain the identity of “Poopie.” The department’s alias files revealed that the name was used by Austin James Green. Perry obtained a file photo of the defendant and took it to David Thomas. Thomas identified the man in the photo as the person who he spoke to at the carwash. Later in the evening of March 10, 1985, Perry and Detective Mona Deville went to the defendant’s home to pick him up for questioning. The defendant agreed to accompany Perry and Deville to the sheriff’s department. He was read his rights by Perry and Deville at that time. The defendant was read his rights again at the station and signed the form signifying that he understood his rights. The defendant told the deputies that he had nothing to do with Carter’s murder. The deputies then booked the defendant as a material witness.
On March 11, 1985 the defendant was released upon the order of Detective Mallet who felt there was a lack of probable cause to hold him. However, the defendant was asked to accompany Mallet, Perry and De-ville to the Sherrelle and Earl King’s home to verify his story. The deputies questioned Earl Hanchett, the bartender, René Coleman, the waitress, and King concerning the events of Thursday, March 7. All three said they saw the defendant and Carter together at the Sherrelle that afternoon. King left before Carter and the defendant, but Hanchett and Coleman said that Carter and the defendant left together.
The defendant was asked to return to take a polygraph test the following day. On Tuesday afternoon a polygraph test was administered, the results of which were unfavorable to the defendant. Upon returning to the sheriff’s office in Opelou-sas, the defendant was arrested for the first degree murder of George Carter and read his rights at that time. The following day, March 13, 1985, the defendant was again questioned after having been read his rights. At that time he told the deputies that he had some information about the murder, but wanted assurance that he would not be charged if he gave the information. A phone call was made to the District Attorney, Morgan Goudeau, to secure an understanding that the defendant would not be charged if he was not personally involved. When these assurances were made, the defendant told the deputies that René Coleman and a man named Shorty killed Carter and that they paid him to help them dispose of the body and the truck. After the statement was recorded and signed by the defendant, he took them to the bridge that the body was dumped from and to the parking lot where the truck had been abandoned.
The sheriff’s office had discovered, prior to March 14, that the defendant had spent the evening and early morning hours of March 7 playing cards at Laura’s Hangout. He had with him a substantial amount of money which he claimed were funds from his Social Security disability check. It was also discovered that Carter had cashed his payroll check on the afternoon of the March 7. The check was in excess of $800.
On Thursday, March 14, Deputy Mallet asked the defendant’s mother to come to the sheriff’s office, after a member of the *269 sheriff’s posse overheard the defendant talking to his mother about money in her possession. He instructed her not to give it to anyone. Mallet told Mrs. Green that the defendant wanted his money and requested that she turn it over to them. Mrs. Green agreed and two deputies accompanied her to her home to retrieve the money. Mrs. Green gave the money to the deputies and accepted a receipt for it.
Later on the evening of March 14, the defendant, when confronted with the inconsistencies in his statement, told Mallet that he wanted to tell them the truth. He asked that his mother be allowed to join them when he gave his statement. In the presence of his mother and the deputies, the defendant confessed that he had killed Carter, but that it was in self-defense. The defendant denied taking any money from Carter. He said that after he stabbed Carter, he took the body to the area where it was discovered, dumped it, stopped at K-Mart in Lafayette to buy a new cap, abandoned the truck at the University Medical Center, then took a cab home. The defendant claimed that he and Carter had been smoking marijuana before the murder and a dispute arose concerning certain marijuana cigarettes. Defendant said that Carter became hostile, took a knife from under the truck’s seat and came after the defendant who was still in the truck. Defendant attempted to get out of the truck and upon doing so a struggle ensued during which Carter was stabbed repeatedly. Carter bled to death from a wound to his heart. The autopsy revealed that Carter had a blood alcohol level of .218.
The defendant was taken before a judge for arraignment on Friday, March 15, and at that time counsel was appointed to represent him. Following the arraignment, the defendant took a deputy to the locations along La. Highway 1-49 near Lafayette where he allegedly disposed of the murder weapon and Carter’s money clip and other belongings. None of these items were ever recovered. The defendant maintained that Carter had only $2 or $3 on him when he was killed. His watch was found on the bridge from which the body was dumped.
ASSIGNMENT 1
By this assignment the defendant contends that the trial court erred in denying the motion to suppress evidence filed on April 8, 1985, and in allowing the prosecution to introduce at trial the money given to sheriff’s deputies by the defendant’s mother.
The thrust of the defendant’s argument is that this evidence was gained through deceit and that it is not within the consent exception to the warrant requirement.
The defendant maintained that the $280 taken from his mother was what remained of a $325 disability check which he received on March 1. However, the defendant’s expenditures and disbursements made during the period would not leave the sum of $280, even including certain card game winnings alleged by defendant in the amount of $60 or. $70.
The trial court found that the circumstances surrounding Mrs. Green giving the money to the deputies did not constitute a search. Mallet admitted that he lied when he told Mrs. Green that defendant wanted his money, but Mrs. Green testified that she would have given it to them regardless of the lies.
Based on the trial court’s finding that no search and seizure occurred, the motion to suppress was denied, and the money was admitted into evidence at trial.
We find no error in the trial court’s ruling on the lack of a search and seizure. See State v. Morris, 340 So.2d 195 (La.1976). Additionally, the introduction into evidence of the money was not error in light of defendant’s conflicting testimony concerning what he had and what he had spent. The weight to be given to the money as evidence of a robbery was for the jury to decide. State v. Holmes, 354 So.2d 1282 (La.1977).
ASSIGNMENT 2
By this assignment the defendant contends that the trial court erred in denying the motion to suppress the defendant’s *270 statements, in that all of the statements were the product of an initial illegal arrest, and were otherwise “fruits of the poisonous tree” in that they were obtained in violation of defendant’s right to counsel and were not freely and voluntarily given.
At issue are the five statements, written and oral, made by the defendant to sheriff’s deputies between March 10 and March 15. Three oral statements were made on March 10th, 12th and 13th. Two written statements were made on March 13th and 14th. The first statement on March 10 and the statements made on March 13th and 14th are inconsistent. In all instances, the defendant was read his rights and testified that he agreed to make the statements. The defendant testified that he requested that the deputies contact a local attorney) Ed Lopez, for him on one or two occasions. All of the deputies testified that the defendant neither asked for nor communicated in any way a desire to have an attorney present. The defendant did not try to call an attorney while he was detained, even though he had several opportunities to make telephone calls. He asked his mother to try to contact Ed Lopez.
The threshhold inquiry is whether the initial arrest of the defendant was made with probable cause. The Louisiana Supreme Court in State v. Billiot, 370 So.2d 539, 543 (1979) said that:
“Probable cause exists when the facts and circumstances known to the arresting officer, and of which he has reasonably trustworthy information, are sufficient to justify a person of ordinary caution in believing that the person to be arrested has committed a crime. State v. Davis, 357 So.2d 519 (La.1978); State v. Dunbar, 356 So.2d 956 (La.1978); State v. Johnson, 249 La. 950, 192 So.2d 135 (1966). To determine the existence of probable cause, the court must examine the “ ‘facts and circumstances within the arresting officer’s knowledge, and of which he has reasonably trustworthy information;’ ” State v. Linkletter, 345 So.2d 452 (La.1977); and do so in light of the experience of reasonable people, not legal technicians. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Probable cause is not absolute cause. Actions of lawmen, therefore, may be supported by less evidence than would justify a conviction. The strength of the requisite probable cause varies with the magnitude of the intrusion and the alternatives available to the peace officer. In the first instance the determination of probable cause is a matter for the trial judge depending, as it often does, upon factual determinations and the credibility of witnesses.”
The trial court found that on March 10 Deputies Perry and Deville detained the defendant, that he was not free to go and that the officers intended extended restraint; consequently the defendant was under arrest.
“An arrest is the taking of one person into custody by another. To constitute an arrest there must be an actual restraint of the person. The restraint may be imposed by force or result from the submission of the person arrested to the custody of the one arresting him. La. Code Crim.Pro. art. 201.” Billiot at 543.
The trial court then analyzed the facts and circumstances known to the officers at that time which would have constituted probable cause for the arrest. Those facts were:
1) The deputies knew a crime had been committed (i.e., Carter had been murdered on March 7).
2) Green was the last person known to be seen with Carter before Carter’s body was found on March 8.
3) Deputy Perry knew that Carter had died sometime in the early evening of March 7.
4) Green was seen in Carter’s truck at Guidry’s carwash in the early evening of March 7 (between 7:00 or 8:00 p.m.).
5) When Green was questioned by David Thomas as to Carter’s whereabouts, Green replied, “he’s taking care of business.”
6) Thomas said that Carter usually did not lend his truck to anyone.
*271 7) Green never reported to the police that either Carter or his truck was missing.
Based on this, the trial court concluded that Deputy Perry acted with probable cause when he arrested the defendant on March 10. We find no error in this. The trial court went on to find that the statement taken on March 10 was made freely and voluntarily by the defendant. We agree.
However, the defendant contends that the remaining statements were taken in violation of the defendant’s Sixth Amendment right to counsel. The defendant testified throughout these proceedings that he signed the rights forms and agreed to make the statements which he thereafter signed. He understood his rights and no promises, threats, duress or coercion were used to obtain the statements. The trial court concluded, and we agree, that the defendant, no stranger to the criminal justice system, did not communicate his desire to have counsel retained and present. As the trial court stated: “Whether this defendant went looking for Ed Lopez or didn’t go looking for Ed Lopez or whether he sent his mother to go look for Ed Lopez[,] unless all [of] these facts were communicated tó these officers, and I have no evidence that it was, all of this makes no difference to this hearing.” In State v. Thibodeaux, 414 So.2d 366, 368 (La.1982) our Supreme Court stated that:
“Conclusions of a trial court on the credibility and weight of testimony relating to the voluntariness of a confession are given great weight and will not be overturned unless they are supported by the evidence. State v. Jackson, 381 So.2d 485 (La.1980); State v. Manning, 380 So.2d 46 (La.1980); State v. Gaines, 354 So.2d 548 (La.1978).”
This assignment lacks merit.
ASSIGNMENT 3
By this assignment of error the defendant contends that there was no evidence presented by the State to prove beyond a reasonable doubt that the stabbing of George Carter was not done in self-defense . or if there was some evidence presented to rebut the defense of self-defense, that such evidence was insufficient to rebut this defense. In State v. Brockington, 437 So.2d 994, 997 (La.App. 3d Cir.1983), the court said that:
“Where self-defense is claimed by the defendant, the State has the burden of proving beyond a reasonable doubt that a homicide was not perpetrated in self-defense. State v. Savoy, 418 So.2d 547 (La.1982); State v. Collins, 306 So.2d 662 (La.1975); State v. Patterson, 295 So.2d 792 (La.1974); State v. Sharp, 338 So.2d 654 (La.1976). A homicide is justified as self-defense only if a person using such force reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. State v. Guinn, 319 So.2d 407 (La.1975).
“An aggressor or one who brings on difficulty, as a general rule, cannot claim the right of self-defense unless he withdraws from the conflict in good faith and indicates his intention of abandoning the difficulty. State v. Stroud, 198 La. 841, 5 So.2d 125 (1941); State v. Leslie, 167 La. 967, 120 So. 614 (1929); La.R.S. 14:21. Where doubts exist as to whether the accused was an aggressor, the possibility of retreat is only one of many factors for the jury to consider in determining whether the defendant has a reasonable belief that the killing was necessary. State v. Collins, 306 So.2d 662 (La.1975). Factors to be considered in determining whether the party attacked had a reasonable belief that it was necessary to kill are the excitement and confusion of the occasion, the possibility of using force or violence less than killing, and the party’s knowledge of his assailant’s bad character. Reporter’s Comment to La.R.S. 14:20.”
The defendant testified in great detail about how he was attacked by the victim in a dispute over some missing marijuana cigarettes. There were no witnesses to the crime.
*272 Dr. James Freeman, who performed the autopsy, testified that the victim suffered three stab wounds to his back and three to his chest, neck, and abdomen. Two of the wounds to the back were of a serious nature, however the wound to the chest was fatal. He discovered no other marks, bruises or abrasions to the body which might indicate defense wounds commonly found on people who are struggling. There were no defense marks found on the hands. The victim’s blood alcohol was .218. No other toxicological tests were performed except to detect the presence of cocaine.
The victim’s wife, Mrs. Carter, testified that her husband had no knife with him when he was killed. Mrs. Carter stated unequivocally that she knew which knives her husband owned and used in his work, and that all of his knives were at their home. This was corroborated by Mr. Joseph Ned.
The defendant testified that the victim drank several beers and that he and the victim had smoked eight marijuana cigarettes. This testimony and the medical evidence indicate that the victim was seriously impaired by drugs and alcohol and would have been an unlikely, and most ineffective, assailant.
Various other witnesses testified that the defendant appeared unimpaired and acted normally during the course of the evening and night.
After the defendant killed Carter, he hid the body in some brush, then fearing discovery decided to dump it elsewhere. The defendant contends that his paralyzed foot prevented him from fleeing from his assailant, yet he was able to carry or drag a grown man’s body to hide it, then carry it back, then hoist it into the pickup truck, and finally to dump it over a railing of a bridge into a bayou below. The defendant burned his clothing, washed the blood from the parking lot, went home to eat a sandwich, and spent the night playing cards with friends at Laura’s Hangout. After leaving Laura’s Hangout he accompanied a woman to a motel in Port Barre, after which he went to his mother’s house in Opelousas where he slept until 3:00 p.m. on Friday, March 8.
After a careful review of this lengthy record, we find that there was sufficient evidence presented by the prosecution such that a trier of fact could find, beyond a reasonable doubt, that this homicide was not committed in self-defense.
This assignment is without merit.
ASSIGNMENT 4
By this assignment of error the defendant contends that the trial court erred in denying his motion for a new trial. Specifically, the defendant contends that the verdict was contrary to the law and evidence, in that there was no evidence that an armed robbery was committed.
The evidence presented to support the charge of armed robbery was:
1) the victim was known to have cashed an $885 paycheck prior to his death;
2) no money was recovered on the victim;
3) the defendant had $280 one week after the murder;
4) the defendant admitted to taking the victim’s pickup truck in order to dispose of the body and otherwise conceal the crime; and
5) a knife, the ownership of which is unknown, was used in the commission of the crime.
Armed robbery as defined in LSA-R.S. 14:64 A is:
“[T]he taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.”
No one who testified relative to the events of March 7 ever saw a large quantity of money on the victim. The only testimony concerning the money came from the bank teller who cashed the check. The defendant was seen later that night with at least $100 in his possession. The defendant receives a disability check on the first of each month in the amount of $325. He claimed that the money he had was his *273 money. The $280 recovered from defendant’s mother was claimed to be what was left of the original $325, plus money from other sources. The prosecution went to great lengths to have the defendant list and account for all sums which he spent prior to the time that the $280 was given to the sheriff’s deputies.
Although the total amount the defendant claimed he had as of March 1, less the amount that he spent, is less than $280, it is not considerably less. No great amount of money was recovered which would be inconsistent with the defendant’s claims. We do not believe that the prosecution proved that the $280 was the proceeds of the victim’s $885 check. The discrepancies in the defendant’s testimony do not establish beyond a reasonable doubt that the money was taken from the victim.
Additionally, the taking of the truck occurred subsequent to the victim’s death. While defendant was armed with a knife, there is no evidence that there was any intent to take the truck prior to the victim’s death. We believe the intent to take by force or intimidation must have been formed prior to the victim’s death.
In its discussion of the test for the sufficiency of the evidence in the case of State v. Porretto, 468 So.2d 1142, 1146 (La.1985), the court said:
“The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates that ‘assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.’ This is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis for the conviction. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. State v. Wright, 445 So.2d 1198 (La.l984).”
When viewing the evidence presented in the light most favorable to the prosecution, we find that it failed to prove beyond a reasonable doubt the elements of armed robbery of the victim by either the taking of his money or his truck by the defendant. This assignment has merit.
ASSIGNMENT 5
By this assignment of error, the defendant maintains that it was error for the trial court to refuse to allow René Coleman to explain her understanding of George Carter’s request for a “joint.” Defendant contends that this would corroborate his explanation of the facts of this case.
René Coleman, the waitress at the Sher-relle, overheard Carter ask the defendant for a joint while in the lounge. When asked by defense counsel what she understood them to mean, the prosecution objected. The trial court sustained the objection. Defendant argues that this resulted in prejudice to him, because he alleged that he killed Carter in self-defense after an altercation arose concerning some marijuana cigarettes.
The defendant has never alleged that Carter attacked him because defendant refused to give Carter marijuana cigarettes or that it was defendant’s marijuana that Carter wanted at the time of the altercation. Rather, defendant testified that Carter obtained his own marijuana that afternoon, defendant rolled 11 joints, defendant and the victim smoked approximately eight joints, and the altercation developed when Carter’s own marijuana cigarettes had apparently disappeared.
René Coleman’s testimony provides nothing more than the information that Carter wanted to obtain some marijuana, which he ultimately did from other sources, and very *274 generously shared with the defendant. The testimony only corroborates the fact that the defendant and Carter had some association concerning marijuana on March 7. It does nothing to corroborate defendant’s defense that the victim attacked him.
This assignment is without merit.
ASSIGNMENT 7
The defendant contends that it was error for the trial court to overrule the objection of defense counsel to the redirect questioning of Dr. Freeman concerning defense wounds or bruises on the victim’s body, as it went beyond the scope of cross-examination.
On cross-examination of Dr. Freeman, defense counsel asked the following questions and elicited the following responses:
“Q. You mentioned that there were no defense wounds on other parts of the body, of this particular individual’s body.
A. We generally describe defense wounds almost exclusively on the hands.
Q. What types of defense wounds were you looking for?
A. People who are in altercations of one type or another, especially when one has a knife and the other doesn’t, they tend to grab at the knife and when they do they get wounds in the palms of their hands and sometimes on upper surface but usually in the palms of the hands and there are generally wounds that are cut across the fingers in almost a horizontal fashion. We call these defense wounds.
Q. And that I’m assuming would mean that someone’s trying to defend themselves from some type of knife wound?
A. That’s correct.
Q. What if that person is the aggressor and at some point has the knife in his hand, you would not necessarily expect to have defense wounds in a case like that would you?
A. You may not find defense wounds.”
On redirect examination, the prosecution asked:
“Q. Doctor did you look for bruises or marks other than slash marks on the hands?
A. Certainly, we always do.
Q. Were there any marks, bruises on the arms, wrists or any part of the body?”
Defense counsel noted her objection to these questions as being outside of the scope of her cross-examination. Our review of the record reveals that this information was originally elicited on direct examination and covered again on cross-examination. Mr. Richard’s questions on redirect clearly did not exceed the scope of defense counsel’s cross-examination.
This assignment is without merit.
ASSIGNMENT 8
The defendant alleges that it was error for the trial court to admit into evidence the State’s exhibits 8D and 8F, which were photographs of the victim taken during the autopsy procedure, and exhibits 9A and 9B, which were photographs of the victim at the site of discovery.
A panel of this court said in State v. Segura, 464 So.2d 1116, 1121 (La.App. 3d Cir.1985), writ denied, 468 So.2d 1203 (La.1985) that:
“When the court is faced with a question of admissibility of allegedly gruesome photographs which defendant asserts will do more to prejudice the jury than help them to reach a fair and impartial decision, the court must ‘weigh the relative probative value of the proffered evidence against its probable prejudicial effect.’ As a general rule, such a determination is left to the sound discretion of the trial judge who can best decide whether such evidence has a proper place in the jury’s understanding of the issues. The trial judge’s ruling in these matters will not be disturbed absent a clear showing of abuse of his discretion.” (Citations omitted.)
*275 In this case, as in Segura, the allegedly gruesome photographs 8D through 8F were introduced in conjunction with the testimony of the pathologist who performed the autopsy. The photographs were clinical in nature and illustrative of the location, size and number of the stab wounds inflicted upon the victim.
Photographs 9A and 9B of the victim as he was found are illustrative of the manner in which the victim’s body was disposed of by the defendant. “Generally photographs of a deceased victim have been held relevant to prove corpus delicti; to corroborate other evidence of the manner in which death occurred; ... and to establish the identity of the victim. State v. Perry, 420 So.2d 139 (La.1982); State v. Tonubbee, 420 So.2d 126 (La.1982).” State v. Lang, 430 So.2d 1239 (La.App. 1st Cir.1983).
The determination that the probative value of allegedly gruesome photographs outweighs the possible prejudice that may result from their display to the jury is largely left to the discretion of the trial court, and its ruling will not be disturbed absent a clear showing of abuse of that discretion. We find no error in the trial court allowing the photographs to be introduced into evidence.
This assignment is without merit.
SUPPLEMENTAL ASSIGNMENTS OF ERROR NOS. 10, 11 and 12
These are arguments raised by the defendant, pro se, in his supplemental brief. Assignments of error numbers 1 through 9 provide no new arguments. Assignments of error numbers 10, 11 and 12 request review of the record for certain errors patent.
In these assignments of error the defendant argues on his own behalf that there were various errors patent committed in his trial. Although the defendant’s articulation of these assignments of error is somewhat inartfully drawn, they urge contentions growing out of the following facts.
On March 20, 1985 the grand jury returned separate indictments for first degree murder and armed robbery against the defendant. He was arraigned on these charges subsequent to the grand jury indictments. On October 25,1985 the district attorney filed a bill of information amending the charge of first degree murder to second degree murder and joining it with the charge of armed robbery. The defendant was re-arraigned in open court at that time on those charges.
The defendant contends that it was error to join charges of murder and armed robbery, because the original indictment for first degree murder was not triable by the same mode of trial as that provided for armed robbery. Defendant does not argue that the offenses for which he was actually tried are triable by different modes of trial. Rather, it appears that defendant’s conception of the assignments of error is based upon Articles 382 and 782 of the Code of Criminal Procedure. LSA-C.Cr.P. art. 382 provides in part that a prosecution for an offense punishable by death, or for an offense punishable by life imprisonment, shall be instituted by indictment by a grand jury. LSA-C.Cr.P. art. 782A provides for different modes of trial for different classes of offenses in the following language:
“A. Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. Cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.”
We take it that defendant reasons that the amendment of the first degree murder charge by the filing of the bill of information to downgrade the offense to second degree murder was defective. As a result, defendant appears to reason that he was actually tried for first degree murder. In any event, because he was first charged (through the indictment) with first degree murder, defendant reasons that the murder charge should have been tried under a dif *276 ferent mode of trial than the mode of trial provided for armed robbery. In other words, defendant claims the prosecution was defective because conviction of the murder charge would require a concurrence of all 12 jurors, whereas a conviction of armed robbery would require a concurrence of only 10 of 12 jurors.
The defendant’s contentions are without merit.
The amendment of the murder charge by the filing of the bill of information to second degree murder was valid. Under the circumstances, prosecution for the two offenses, second degree murder and armed robbery, could be pursued through the same mode of trial. The filing of a bill of information charging defendant with second degree murder following a grand jury indictment for first degree murder, and defendant’s arraignment on that charge, has been held to be nothing more than a formal amendment of the grand jury indictment and was therefore permissible. State v. Freeman, 447 So.2d 1145 (La.App. 3d Cir.1984), writ denied, 449 So.2d 1356 (La.1984). Thus, the abandonment of the first degree murder charge for the lesser offense of second degree murder was proper. Also, joinder of the second degree murder charge with the armed robbery charge was proper under LSA-C.Cr.P. art. 493. Under that article two or more offenses may be charged in the same bill of information in a separate count for each. This is what was done in this case. The offenses were based on the same act or transaction as required by Article 493. The offenses joined in the district attorney’s bill of information are both triable by 12-person juries and require the concurrence of 10 of the 12 to render a verdict. La. Const, art. 1, Sec. 17, and LSA-C.Cr.P. art. 782 A. Therefore, the charges for the two offenses were triable by the same mode of trial as required by LSA-C.Cr.P. art. 493. We find no error in the proceedings as urged by the defendant.
These assignments of error are without merit.
CONCLUSION
For the reasons stated herein, the defendant’s conviction for armed robbery is reversed and his sentence is vacated. The conviction for second degree murder and the sentence to life imprisonment without benefit of parole, probation or suspension of sentence are hereby affirmed.
REVERSED IN PART; AFFIRMED IN PART.
DOMENGEAUX, J., concurs on the affirmation of the second degree murder conviction but dissents the reversal of the armed robbery conviction.